## Case No. 414.

### The ANN GREEN.

[1 Gall. 274.][1]

Circuit Court, D. Massachusetts. Oct. Term, 1812.[2]

PRIZE — SHIP'S PAPERS AND CREW — EVIDENCE— WAR—NEUTRAL SHIPPER — DOMICIL — SALVAGE —FREIGHT.

1. In prize causes the first hearing is to be on the ship's papers, and the preparatory evidence of the ship's crew. If these acquit or condemn, there is an end of the cause. If they present a case of doubt or difficulty, further proof is admissible by order, or by plea and proof. Further proof sometimes allowed to the captors.

2. If the captured crew do not give up papers on the first examination in preparatory, the court will not admit them afterwards. If a witness suppress material facts on his examination in preparatory, he shall not be permitted to supply the defect by a supplementary affidavit. The commissioners to take the answers on the standing interrogatories should not rest satisfied with general answers, but require full and minute details of all material facts.

3. The national character of a party depends upon his domicil. What constitutes such domicil. A British subject domiciled in the United States, though temporarily absent in a British island, is as to purposes of trade-held to be an American merchant.

[Cited in Burnham v. Rangeley, Case No. 2,176.]

4. The question of enemy or friend depends upon the domicil of the party. A shipment made to Canada by a British subject domiciled in the United States, but temporarily at Jamaica, in his character as a British subject, does not, if made in time of peace, affect the property with a hostile character, if war breaks out pending the voyage. But it is otherwise, if such shipment be made pending a known war.

[Cited in The Amado, Case No. 12,005.]

5. In general no claim is admitted in prize causes, in opposition to the ship's papers; but this rule is relaxed in favor of shipments made in peace.

6. Where a neutral is engaged in a trade, which is exclusively confined to the subjects of a country, and interdicted to all others, and cannot avowedly be carried on in the name of a foreigner, such a trade is so purely national, that it must follow the situation of the country, as to peace or war, and be deemed hostile or neutral accordingly; and in such a trade, it is immaterial whether the shipment be made in time of peace or war. The trade between Jamaica and Canada proved not to be of such a character. In time of war property cannot change its character in transitu; nor can property shipped, to become the property of an enemy, be protected by the neutrality of the shipper.

[Cited in The Sarah Starr, Case No. 12,352; The Delta, Id. 3,777.]

7. In order to entitle to salvage, as upon a recapture or rescue from an enemy, the property must have been taken from the actual or constructive possession of the enemy.

8. Captors are not in general entitled to freight on the capture of neutral property on board of an enemy's ship, unless the goods are carried to the port of destination, within the intent of the contracting parties. But if the property be ultimately bound to the market, where the captors carry the ship, or the proceeds are to go there indirectly, a direct communication being prohibited, freight is due to the captors. The captors are entitled to their expenses in all cases of further proof.

[On appeal from the district court of the United States for the district of Massachusetts.]

In admiralty. This was a proceeding on the prize side of the court, on an allegation of prize by the libellant, commander of the privateer Gossamer, against the ship Ann Green and cargo. The ship and all the cargo, excepting fifty-six puncheons of rum, were condemned as enemy's property, no claim having been interposed therefor in the district court. The fifty-six puncheons of rum were claimed on account of Lewis Simond, Charles Wilkes, and Henry Cullen of New York, the asserted owners; and upon a full hearing of the cause in the district court, a decree of restitution passed, subject to freight and the captor's expenses. An appeal was interposed by the captors, and upon the hearing of the cause, which in the first instance was ordered to be upon the ship's papers, and the preparatory examinations, an interlocutory order passed for further proof to be made by the claimants, and that the evidence, which had been irregularly taken for the district court, might upon the final hearing be offered to this court. The facts of the case, so far as respects the present claim, are, that the ship sailed with

------

[1][Reported by John Gallison, Esq.]

[2][Affirming an unreported decree of the district court.]

her cargo from Jamaica for Quebec on the 20th day of June, 1812, and was captured and brought into Boston on the 1st day of August, 1812. A libel was filed, and the deposition in preparatory of the supercargo, Mr. Fish, was taken before the commissioners on the 3d day of August, and returned to the district court. On the 14th of the same August, upon application of the claimants, the examination of Mr. Fish was remanded to the commissioners for further answer on the last interrogatory. The new examination was taken on the 15th of August, and came up in the cause. Upon the original examination, the supercargo to the 12th interrogatory answered, "that the rum was shipped by various merchants living at Jamaica, and consigned to various persons at Quebec, whose names appear in the manifest, and papers delivered to the captors. He knoweth them not personally; but believeth them to be British subjects. The ownership of the rum he cannot declare, but must refer to the papers delivered up to the captors, to ascertain the ownership." To the 14th interrogatory he answered, that he knoweth not of any papers, &c., except those delivered to the captors. To the 16th interrogatory he answered in the negative, that there was no suppression or concealment of any papers, and to the 32d interrogatory he answered, "that he has declared the whole of his knowledge relating to the premises." On his supplementary examination to the last interrogatory, he stated, that after his former examination, and on the same day, he found, in the letter bag of, and on board the ship, fifteen letters, which he produced, and which he supposed had been taken possession of by the captors. That he verily believed those letters were placed in the letter bag at Jamaica, before the ship's departure for Quebec, and that they had ever since remained there. That on the 11th or 12th of August, Mr. Wilkes, one of the claimants, called on him in Boston, and asked, if he had not on board fifty-six puncheons of rum, shipped by Mr. Henry Cullen, or had any letters sent by Cullen; that upon examination of the covers of said letters, Cullen's hand-writing was recognised on two, which were directed to Messrs. John Mure & Co., Quebec, which were then opened and read in the deponent's presence. In one letter was contained a bill of lading signed by the deponent for fifty-six puncheons of rum shipped by Cullen in said ship to be delivered at Quebec; and the other contained two enclosures. That the deponent allowed Wilkes to retain them until this day, when they were returned to him, as he believes, unaltered. That the residue of the letters remain sealed. That the deponent hath no doubt, that the said fifty-six puncheons of rum, at the time of their shipment as aforesaid, and if restored, did, do, and will belong to the house of Simond & Co. of New York,

because he knows it was the general opinion in Falmouth in Jamaica that Cullen was the agent of said house, doing business there as their agent, and not on his own individual account, and that about three weeks before he sailed he knew that Cullen had sent home a vessel, belonging to the house aforesaid, in ballast, although he had a great quantity of rum belonging to the said house then on hand, but could not ship it to the United States. Upon the order for further proof, it was proved that Mr. Cullen was a native of Scotland, and came to New York to live in 1795, being then about nine or ten years old. That on the 10th day of May, 1804, he was naturalized at New York, where he resided until the year 1808. That he was admitted as a partner of the house of Simond & Co. consisting of the claimants, on or about the year 1807, and they, having debts due to them to a large amount, sent him out to Jamaica in 1808, to collect the same. That he was absent at Jamaica about six or seven months, and then returned to New York; and went out a second time in March, 1810, and resided there about a year, and then returned to New York; and went out a third time in October, 1811, and had not yet returned. During all this time the affidavits of the claimants stated, that he was absent upon necessary business, connected exclusively with the collection of the debts due to the company; and there were many corroborative affidavits, which showed the general impression among all his acquaintance at New York, that he did not contemplate a residence at Jamaica for purposes of trade.

In the manifest of the cargo, fifty-six puncheons of rum were stated to be shipped by Henry Cullen, but no consignment was mentioned. No bill of lading appeared to have been found on board, except that which was produced upon the supplementary examination of Mr. Fish. In that the rum was consigned to Messrs. John Mure & Co., and the accompanying letters addressed to them contained instructions to sell and remit the proceeds, or to pay to the orders of Messrs. Simond & Co. The first letter of 26th of June said, "I owe Lewis, Simond & Co., of New York, a considerable sum, and I shall in all probability apply the proceeds of this shipment to the liquidation of that debt." The second letter of the 28th of the same month enclosed a letter to be forwarded to Messrs. Simond & Co. and said, "I now request that you will remit the nett proceeds of these fifty-six puncheons to Lewis, Simond & Co. of New York, or honor their drafts as they shall appear." The enclosed letter to Messrs. Simond & Co. after stating the shipment of the fifty-six puncheons by the Ann, contains the following expressions: "I am shipping about fifty puncheons in the Aid, Capt. Redmayne, on my account, consigned to Messrs. Bruce de Penthieu, Buzett. & Co., London, and the nett proceeds of this

shipment also shall be paid to your order. These two shipments, I regret to say, are all that I am able to apply this year to the liquidation of the heavy debt I owe." Connected with the claimants' affidavits was a letter from Cullen to Messrs. Simond & Co., dated Falmouth, 7th of June, 1812, in which he said, "I am getting from all our correspondents about 100 puncheons rum only, half of which I ship in the ship Ann Green, Capt. Fish, to Quebec, consigned to John Mure & Co., as British property, that is to say, in my own name alone, the other half to Bruce de Penthieu, Buzett & Co. I write this week by the ——— British Packet, to B. de Penthieu, B. & Co. for insurance on both these shipments."

Blake, Dist. Atty., for the captors.

1. The supplemental examination of Fish was irregular. The Speculation, 2 C. Rob. Adm. 293. 2. Cullen, the shipper, is a British subject. His allegiance to that government is, by its laws, inalienable. His naturalization, as a citizen of the United States, cannot extend beyond the limits of the United States. Cullen avows himself a British subject, for he says, "I ship in my own name, as British property." The Bernon, 1 C. Rob. Adm. 102; The La Virginie, 5 C. Rob. Adm. 98; The Indian Chief, 3 C. Rob. Adm. 24; The Citto, Id. 38; The Embden, 1 C. Rob. Adm. 16; The President, 5 C. Rob. Adm. 277; [Baring v. Clagett,] 3 Bos. & P. 207; The Herman, 4 C. Rob. Adm. 228; The Vigilantia, 1 C. Rob. Adm. 12; The Betsey, Id. 97; The Chester, 2 Dall. [2 U. S.] 42; Arnold v. United Ins. Co., 1 Johns. Cas. 363, 364, and note b.; Act March 27, 1804. 3. But, admitting Cullen to be an American citizen, yet having, as a British subject, engaged in a trade allowed to British subjects only, he loses the benefit of his American character, so far as respects such trade. 4. The property was taken in transitu. Whatever might have been done with it, if found in Jamaica upon a conquest of that island, may be done with it, when found on board an enemy's ship. It is true, that by the treaty, goods, &c., are not to be confiscated. But in this case, no process of confiscation is necessary. Bynk. 23, 25, 51, by Duponceau. 5. The captors are entitled to salvage, if the rum is restored. Had it gone to Canada, it would have been confiscated as enemy's property. The claimant therefore is benefited by the capture. The War Onskan, 2 C. Rob. Adm. 299. The rum is of the same value here as in New York. 6. The captors are entitled to freight. The Diana, 5 C. Rob. Adm. 64.

Jackson, in reply, for the claimants.

In this case, the claimants as well as the captors are to be favored, being both citizens of the United States. (As to Blake's first point, Story [Circuit Justice] told Jackson he need not insist). 2. Naturalization by our laws has all the effect of a naturalization by

act of parliament in England. As to us, the original character ceases altogether. Cullen's house of trade in this country is enough to show him not a British subject. Between citizens, this is a question of municipal law; between a citizen and a foreigner, it would be a question of public law. 3. It is assumed that none but British subjects can ship on a British bottom from Jamaica to Quebec; the fact is otherwise. There is no case or statute to support this assertion, and the contrary appears from Mure & Co.'s letters. In The Princessa, [2 C. Rob. Adm. 49,] Sir W. Scott takes it for granted, that a Spanish subject only could ship specie, but he gives no authority for the supposition. 4. Bynkershoek, in the passages cited, speaks only of choses in action. An American army invading Canada, and finding my property there, could not take it as British property. The Packet De Bilboa, 2 C. Rob. Adm. 133. 5. The case of The Packet De Bilboa gives no salvage, but directs only the expenses to be paid. In this case there is no recapture. 6. No freight is due, unless the cargo is brought to the original port of destination. The Fortuna, 4 C. Rob. Adm. 278. By the appeal, the captor's right to freight is taken away, even if he had any before. The property is here as much beyond the reach of the owner, as it would be in some neutral country. It is in a foreign port. Carolina is foreign as to Massachusetts. So are England and Ireland foreign to each other, as to the same point. The freight from Boston to New York is now greater than from Jamaica to that city.

[Before STORY, Circuit Justice, and SHERBURNE, District Judge.]

STORY, Circuit Justice, after a recapitulation of the facts. Such are the facts disclosed in the evidence; and various objections have been argued, and ingeniously argued, which I shall now proceed to consider. In the first place it is contended, that the supplementary examination of Mr. Fish, and the accompanying letters, ought to be rejected. It is undoubtedly the practice of the prize courts to confine the first hearing of the cause to the papers found on board of the ship, and the preparatory examinations. If they acquit or condemn, there is, in general, an end of the cause. If they present a case of doubt or difficulty, further proof is admissible, and this may either be by the common order for further proof, or the more solemn proceeding by plea and proof. But doubts either of condemnation or acquittal may sometimes arise from extrinsic facts presented by the claimant or the captors, and the discretion of the court is sometimes exercised in the admission or rejection of such facts. The prize courts are however very solicitous to preserve the simplicity of their proceedings, and therefore, if the case appear very clear and satisfactory upon the original evidence, they yield with great reluctance to the admission of extrinsic circumstances.

The evidence of papers invoked from other causes, and of papers found on board other ships, does not come within the restriction, and in other instances of pregnant suspicion, or reasonable doubt, the courts will not suffer a rule, founded upon the mere convenience of practice, to exclude the captors from the benefit of diligent inquiries. The Sarah, 3 C. Rob. Adm. 330; The Romeo, 6 C. Rob. Adm. 35; The Vriendschap, 4 C. Rob. Adm. 166. But it is a rule, which every principle of law and of policy requires should not be relaxed, that, as the evidence to acquit or condemn must, in the first instance, come from the ship's papers and preparatory examinations, no papers should be allowed, which are not produced at the first examination. What would be the consequence of a different practice? That parties would, at the first examination, make formal answers, and after full time was given to know the difficulties of the case, papers and evidence would be manufactured to meet them. . Good faith on the contrary requires, that every paper should be disclosed at the first; that parties should tell the whole truth; and that every inducement to concealment or suppression of evidence should be completely discountenanced. And I wish it to be distinctly understood, that if parties will attempt to cover up the real transactions, or withhold them, until counsel can be taken, they can never be permitted in a prize court to supply the first defects. The Anna, 1 C. Rob. Adm. 331; The Speculation, 2 C. Rob. Adm. 293.

In the present case, I think the supercargo, Mr. Fish, has acted with very great impropriety. It is perfectly frivolous to pretend that he did not know but that the captors had these fifteen letters. Where was the ship's letter bag when the ship was captured? Was it given up to the captors? If it had been so, the whole papers would have been before the court; for the prize-master has sworn to the delivery of all ship's papers delivered to him. It is not even now pretended, that the captors had these letters; on the contrary, the evidence is, that they were in the ship's letter bag, and had always remained there on board of the ship. Where was the letter bag kept? No account is given of it; and to suppose that it was not concealed and suppressed. is to suppose that the captors voluntarily relinquished all benefit of evidence, which might go to the condemnation of the property. I have no doubt, therefore, that there was a premeditated suppression and concealment by the deponent, and that, at the time of his first examination, the letter bag was in his possession. Yet he has answered on the subject in a manner, which no honest man can approve. I regret to say, also, that the second examination proves incontestably, if it be credited at all, that Mr. Fish did not tell the whole truth at that time. How slight and vague are his answers to the interrogatories as to the property and papers! Yet, on his second exami-

nation, he has not only new knowledge of facts, but he states that he has no doubt that Messrs. Simond & Co. are the real owners of the rum, and that Cullen acted as their agent; and he relies upon circumstances within his knowledge at Jamaica, to corroborate the opinion. Now let me ask, why were not these facts and circumstances disclosed at the first examination? The witness does not pretend, that the light has just dawned upon him. I must conclude, therefore, that he did not choose to declare all that he had the means of knowing. If he has acted in so unjustifiable a manner, I do not think it any severity to receive his testimony with great hesitation.

I cannot, however, in this connexion, omit to remark, that with very few exceptions, the preparatory examinations are not taken with that fulness and exactness, which the interrogatories require. It is the duty of the commissioners, not merely to require a formal direct answer to every part of an interrogatory, but to require the witness to state the facts with all the minuteness and detail, which belong to them. The commissioners should not be satisfied with a general answer. They know the object of the examination, and it is their indispensable duty to procure a full and explicit and circumstantial answer to every question. If this were always done, much of the uncertainty which now is found in prize causes at a first hearing, would be completely obviated.

But to return. Though I directed this second examination to be admitted under the order for farther proof, it was not that I was satisfied with its legality; on the contrary, I then entertained and still entertain great doubts, if of itself it can be relied on for any purpose; certainly, if any material fact depended upon it, I should not feel safe in the admission. If I do not absolutely reject it, it is only in deference to the entire respect which I feel for the order of the district court. As a general rule, I should pronounce for the inadmissibility of the evidence. I shall leave it therefore where I find it, as it does not materially enter into the judgment which I have formed.

I come now to consider a second objection, which is, that the property must be considered as British property, because, taking the whole evidence together, Cullen was domiciled in Jamaica, and acting in the character of a British subject. It is certainly made out in the evidence, that Cullen has been for four years last past resident a considerable portion of his time at Jamaica; and his letter of the 7th of June shows, that he made the shipment as a British subject. As to the domicil, it is undoubtedly true, that length of time, connected with other circumstances, may go very far to constitute a domicil. "Time," says Sir William Scott, "is the grand ingredient in constituting domicil. I think that hardly enough is attributed to its effects. In most cases it is unavoidably

conclusive." The Harmony, 2 C. Rob. Adm. 322. Upon a residence therefore for temporary purposes, there may be engrafted all the effects of permanent settlement, if it be continued for a great length of time, and be attended with conduct, which demonstrates that new views and new connexions have supervened upon the original purposes; but, on the other hand, mere length of time cannot of itself be decisive, where the purpose is clearly proved to have been temporary, and still continues so, without any enlargement of views; and even the shortest residence, if with a design of permanent settlement, stamps the party with the national character. The Indian Chief, 3 C. Rob. Adm. 12; The Diana, 5 C. Rob. Adm. 60; The Boedes Lust, 5 C. Rob. Adm. 233. The question, after all, results in an inquiry into the intention and conduct of the party; and it is extremely difficult to lay down any general rule upon the subject. If Mr. Cullen were domiciled at Jamaica, at the time of the shipment, he would be liable to all the consequences of a British commercial character; for no principle is better settled, than that the property of a person settled in the enemy's country, although he be a neutral subject, is affected with the hostile character. It is quite immaterial in this view, what was the original or acquired allegiance of Mr. Cullen. A native American citizen is just as much within the scope of the principle as a foreigner. In examining the testimony however, I think it is difficult to resist the impression, that Mr. Cullen's absence was originally for temporary purposes. It is expressly shown, that he went out to collect the debts of the company, and there is no part of the evidence that points to a distinct trade disconnected with those debts. I admit that his connexion in a house of trade in New-York would not alone protect him; for he may at the same time possess the commercial character of several nations. The Jonge Klassina, 5 C. Rob. Adm. 297, and The Vriendschap, 4 C. Rob. Adm. 166, are full to this point. But when his original purposes are shown to be temporary, and the whole transaction was in a time of peace, I do not think the presumption from length of time so forcible.

It is said, that Mr. Cullen was originally a British subject, and that native allegiance easily returns: and La Virginie, 5 C. Rob. Adm. 98, is cited in support of the position. Without pretending to be satisfied with that decision, which with all possible respect for the learned judge, I must say upon the evidence furnished in the report, was rather strained, I accede to the doctrine, that fewer circumstances are necessary to constitute domicil in case of native subjects, than of foreigners: and that as native allegiance easily reverts, so the presumption against the party is much heightened by the shipment being made from a port of his native country. Still, however, it is but a presump-

tion, and if clearly done away, I do not think that a single principle is overturned by a disregard of that circumstance. It is also said, that this shipment was made by Cullen in the character of a British subject, and that this furnishes distinct proof of his having returned to his native allegiance. I agree that such would ordinarily be the case; but a distinction has been taken in the authorities between a time of peace and of war. Much greater laxity is allowed to mercantile transactions in peace than in war. Disguises and covers are allowable in the former, which would not be tolerated in the latter. I do not know that a single case has been decided, in which the assuming a national character in time of peace, to avoid municipal duties or regulations, or to avoid the effects of impending war, has been held to bind the party, where it has not been in fraud of the belligerent who makes the capture. Now it is very clear, that Mr. Cullen did not assume the British character, to evade either the municipal or belligerent rights of the United States. We all know that the introduction of the produce of the British islands into the United States was prohibited. It could only go to British ports. A war was impending; and either to avoid alien duties or British captures, Mr. Cullen might have assumed the British character pro hac vice. Indeed, if the letters produced upon the supplementary examination were admitted to have full effect, this inference would be apparent from the language which is used. These letters are as merely colorable as any that could be offered. If Mr. Cullen had gone on, after the war, making shipments in the British character, I have no doubt that he would have been affected with its penal consequences. But the question now is, if the shipment made in a British character, without being engaged as a general merchant, and without the intention of evading any other but the municipal or belligerent rights of the enemy, shall conclude the party as to his domicil, I cannot say that where the proof is otherwise satisfactory, this circumstance alone ought to draw after it that consequence. I think that great indulgence usually is granted to neutrals and to citizens, as to transactions in time of peace, and at the commencement of a war; and if they contravene no municipal or national policy, I am not prepared to say that this indulgence is inconsistent with law. The Vrow Elizabeth, 5 C. Rob. Adm. 2; The Vreede Scholtys, Id. 5, note. It is also said, that no claim ought to be admitted, which stands in opposition to the papers, and that Mr. Cullen stands in them as sole proprietor; and he traded as a British subject. The general rule certainly is, that no claim shall be admitted against the evidence of the ship's papers; and the reason of the rule is, that fraud may be suppressed and discouraged. If a party will undertake to cover his property with a particular charac-

ter, he shall be bound to its consequences. But an exception as old as the rule itself is, that it applies to cases during open war, and not before the commencement of it, or in time of peace. Parties have been permitted to claim, who in time of peace, or even just before the commencement of war, to elude or deceive the enemy, have assumed neutral or even enemy's colors. It is a stratagem, which if practised in peace, to the injury of a foreign nation, no other thinks itself bound to redress; and if, on the eve of a war, to elude the enemy, it has not been deemed an infringement of national rights. I believe the cases are not uncommon in the books for the property under such circumstances to assume altogether a fictitious or hostile name. The Vrow Anna Catharina, 5 C. Rob. Adm. 15, 161; La Flora, 6 C. Rob. Adm. 1; The Vrow Elizabeth, 5 C. Rob. Adm. 2, 5, note.

But does this property stand altogether documented in opposition to the claim? I think not. It is claimed by the house of L. Simond & Co. and is documented in the name of one partner of that house; and this with a view not to defeat American but British rights. But even if it had stood documented as British property, I think it would be entitled to very favorable considerations. Its real character is now shown, and I entertain no doubt, that the property did belong to Messrs. Simond & Company. Its being found on board a British ship, even with British documents, does not prevent me from looking at the interest of the real owners, and decreeing under the circumstances of the case in their favor. The Vreede Scholtys, 5 C. Rob. Adm. 5, note. Very different considerations would have applied, if the shipment had been made after knowledge of the war. I think therefore that this part of the case has been fully answered, and that the facts disclosed show that Cullen was at Jamaica for a temporary purpose only, that of collecting debts, and that no act there done has impressed him with a renewal of British character.

Another objection of a more general cast has been urged. It is, that admitting that Cullen was domiciled in the United States, still the trade was hostile, and such as exclusively belong to British subjects, and therefore the property is confiscable. There can be no doubt, that a trade may be hostile, and affect the party with condemnation, although he be a neutral, or citizen of our own country. Such is the common case of a citizen engaged in trade with the enemy; and according also to British doctrines, a participation in the coasting or colonial trade of the enemy. To these doctrines, as to the colonial and coasting trade, I am not called upon to give any assent, and I by no means wish to be considered as acquiescing in them. Whenever Great Britain shall be a neutral, perhaps there will not be any hardship in enforcing her own doctrines against her; but as to other neutrals, the question will deserve great consideration. But however it may be, as to the general colonial trade, I think that it may well be admitted as a principle of national law, that where a neutral is engaged in a commerce, which is exclusively confined to the subjects of a country, and is interdicted to all others, and cannot be avowedly carried on in the name of a foreigner, such a commerce is to be considered as so entirely national, that it must follow the situation of the country. The property is considered as so intimately incorporated into the commerce of the country, that it receives its character solely from that commerce. In this view, though the property may be neutral, yet the commerce, in which it is engaged, may be hostile, and induce a confiscation. Such I understand to be the opinion of Sir William Scott in The Anna Catharina, 4 C. Rob. Adm. 107, The Princessa, 2 C. Rob. Adm. 49, and The Rendsborg, 4 C. Rob. Adm. 121, and I am not disposed at all to question the sound policy or principle, which dictated those decisions: and I admit further, that in such a trade it is quite immaterial whether the shipment be in peace or in war. The question then will be, whether the trade between Jamaica and Quebec be such a trade; for if it be, then it must be followed with all the consequences, which I have stated. It is affirmed on one side, and denied on the other. I should have been glad that the learned counsel, who made this objection, would have furnished me any statutes or authorities of the British government in proof of his position. I am aware, that between British colonies the trade is confined in general to British ships. The statute of 7 & 8 Wm. III. c. 22, prohibits in general the exportation of any goods or commodities from any British colony, except in British ships. But goods, which may be exported in British ships, may be exported from one colony to another. And by the St. 12 Car. II. c. 18, § 2, no alien, unless naturalized or a denizen, is allowed to exercise the trade of a merchant or factor in any British colony. These are the only provisions, which I have been able to meet with in those works, which seemed best adapted to convey the information, (Reeves, Shipp.; 6 Com. Dig. "Trade;") but they by no means establish the position in its full extent. They show extreme caution and jealousy as to the plantation trade, but by no means show that none other than a British subject would be allowed to export in a British ship from one colony to another. I do not understand, that the captors can produce any evidence to this effect; and certainly unless they do, no inference ought to be drawn against the claimants. If further proof on this point had been urged, I should have required it. As it has not been, and the cause has come to a final hearing, I feel myself bound to declare, that I have no evidence of such an

exclusive trade, as affects with a hostile character the property in question. It has been further argued, that this capture, being made while the property was in transitu, and war intervening, it is to be considered as enemy's property, because it would have become such upon arrival at the port of destination; and at all events it would have been liable to seizure and confiscation. As to the fact that the property was taken in transitu, I do not perceive how of itself it can affect the rights of the parties either way; nor do I perceive how this property was to have become enemy's property on its arrival. The case proved is, that it was American property consigned for sale only, and not a consignment where the property was, at the time of shipment or of arrival, to belong to the consignee. The cases are, as I think, settled upon just principles, that decide that in time of war, property shall not be permitted to change character in its transit; nor shall property consigned, to become the property of the enemy on arrival, be protected by the neutrality of the shipper. Such contracts, however valid in time of peace, are considered, if made in war or in contemplation of war, as infringements of belligerent rights, and calculated to introduce the grossest frauds. In fact, if they could prevail, not a single bale of enemy's goods would ever be found upon the ocean. The Vrow Margaretha, 1 C. Rob. Adm. 336; The Carl Walter, 4 C. Rob. Adm. 207; The Jan Frederick, 5 C. Rob. Adm. 128; The Constantia, 6 C. Rob. Adm. 321; The Atlas, 3 C. Rob. Adm. 299; The Anna Catharina, 4 C. Rob. Adm. 107. Where however the contract has been made during peace, it has received a more liberal consideration; and the case of The Packet De Bilboa, 2 C. Rob. Adm. 133, so much relied on by the captors' counsel, clearly shows that the property, notwithstanding a consignment to a party, who afterwards becomes an enemy, if made at the risk of the shipper, in peace, will be protected. Indeed that case, in some respects, goes the whole length of the present.

As to the other suggestion, that the property would on arrival have become subject to confiscation, as American property; and therefore is to be considered precisely as if it had arrived and been confiscated, I certainly know no principle of law which would allow me to condemn in such a case. If an American vessel be captured and recaptured, the argument that it had become enemy's property, would be much stronger, and yet it has never been allowed to prevail. Even supposing that upon arrival this property would have been liable to confiscation, and certainly by the law of nations the government would have a right of confiscation, (Bynk. Ques. Pub. Jur. c. 7,) I am not aware how I can hold that to be done, which might by possibility have been done. It has not been the modern usage to extend the right of confiscation of enemy's property found in a country at the beginning of a war; and I may say, that in general it has been reluctantly admitted. That it would be insisted on in all its rigor, I shall not deem myself obliged to presume. As between Great Britain and the United States there is a stronger reason not to presume it, inasmuch as the 10th article of the treaty of 1794 prohibits it, as to debts and money in the funds and in banks, and declares it unjust and impolitic. But there is no necessity of adverting to this consideration, for I am well satisfied, that if upon arrival at Quebec, the property would have been liable to confiscation, that circumstance, so far from opening a ground of condemnation, would rather incline the other way. The argument on this head is therefore wholly inadmissible.

It has been next contended, that the captors are entitled to salvage, if the property is deemed American, because it has been saved from the grasp of the enemy; and The War Onskan, 2 C. Rob. Adm. 299, has been cited, to prove that salvage is due in all cases, where a benefit is conferred. I rather think that the position is laid down too broadly, for upon that footing a person giving information of the war might be entitled to salvage; yet no such claim has ever been admitted; and though rescue from the attack of an enemy, by approaching with a superior force, would be a clear case of salvage; yet it has been denied. In order to entitle to salvage, as upon a recapture or rescue, the property must have been in the possession, either actual or constructive, of the enemy. The Edward and Mary, 3 C. Rob. Adm. 305; The Franklin, 4 C. Rob. Adm. 147. There is no case where military salvage has been allowed, merely from stopping a ship going into an enemy's port: and the case of The Packet De Bilboa, 2 C. Rob. Adm. 133, 138, and The Franklin, 4 C. Rob. Adm. 147, are clearly the other way. I shall adhere to those decisions, because they are founded in fair and equitable principles.

It has been further contended, that at all events the captors are entitled to freight and expenses. The general rule undoubtedly is, that the captors are not entitled to freight, unless the goods are carried to their original destination, within the intent of the contracting parties. But it is argued that this is an intermediate case, and within the equity of the decision in The Diana, 5 C. Rob. Adm. 67. In that case, the goods were destined to Amsterdam, with an intention that they should, in specie or in proceeds, ultimately be remitted to England; and the court held, that as the goods were brought to London, to the port to which the claimant would have sent them directly, if he had not been prevented by the policy of the Dutch government, which refused the exportation of the produce of its colonies to any but the mother country, the freight was due. It has been argued on the other side, that the case is inapplicable, because New York

would have been the port of destination, if the parties could have lawfully pursued their voyage thither; and that Boston being a port of another state, cannot be within the reason of the case, any more than any other foreign port. I readily admit that the cases do not run upon all fours, but the principle strikes me as fully applicable. The parties would have brought the property directly into the United States, if they could. They contemplated the remittance of the proceeds to the United States. I say to the United States, because it will hardly be contended that if the proceeds had been remitted to Boston for the use of the claimants, it would not have been as much within their intention, as a remittance to New York. In a commercial view, these cities must be considered from their proximity almost as one. Nor can I consider Boston as a foreign port in any view connected with this question. It is as much a port of the same country, as a port in Scotland is of Great Britain. And though Sir William Scott appears in The Diana to rely somewhat upon the circumstance, that London was the port to which the claimants would have pointed as the destination; yet in The Vrouw Henrietta, 5 C. Rob. Adm. 75, note, be held, that where the goods were unloaded at Plymouth, and the claimant resided at London, the freight was payable, and he overruled the distinction now contended for. For myself, I have no hesitation to declare, that independent of all authority, where the proceeds of the goods were ultimately intended for this country, and they had been saved from the grasp of the enemy by the capture, I should allow a full and complete freight. It is in vain to shut our eyes against the real benefit conferred on the claimants.

As to expenses, independent of all other circumstances, as this was a case of further proof, they ought to be allowed to the captors. The questions, too, which have been argued, were very properly brought before the court, and I am glad that the sum in controversy will enable the parties, if dissatisfied with my judgment, to apply to the highest tribunal. In allowing the expenses I have the authority of Sir W. Scott, if the allowance require any authority, in the case of The Packet De Bilboa. And I take a pleasure in declaring, that however lightly the English courts may affect to treat our decisions, I shall not hesitate upon this or any other occasion to acknowledge my obligations to the learning and sagacity of that eloquent and able judge. I affirm the decree of the district court, and order the freight, at the price in the bill of lading, and all the expenses of the captors, of both courts, to be a charge on the goods.