AUGUSTA C. MATHER AND HELEN E. BERRY, Appellants,

*vs.*

EDWARD R. CUNNINGHAM AND ALBERT W. CUNNINGHAM.

Waldo.    Opinion April 15, 1909.

*Domicil — of Origin — of Choice. How Domicil may be Established. Evidence of Domicil. Foreign Domicil. American Citizen may Acquire Domicil of Choice in Shanghai, China. Immiscibility.*

Domicil is said to be the habitation fixed in any place without any present intention of removing therefrom.

"Domicil" in its usual sense does not present a complex or difficult problem, and ordinarily it is a pure question of fact.

While the term domicil seems to possess more or less elasticity, yet there can be but one domicil of testacy or intestacy.

The fundamental idea of domicil is a relation between an individual and a particular locality or country, and does not depend upon any distinction with respect to the source of the local law.

No exact definition can be given of domicil. It depends upon no one fact or continuation of circumstances, but from the whole taken together which must be determined in each particular case.

It is a maxim that every man must have a domicil somewhere, and also that he can have but one. It follows that his existing domicil continues until he acquires another and, vice versa, by acquiring a new domicil he relinquishes his former one. Very slight circumstances must often decide the question. It depends upon the preponderance of the evidence in favor of two or more places, and it often appears that the evidence of facts tending to establish a domicil in one place would be entirely conclusive were it not for the existence of facts and circumstances of a still more conclusive and decisive character which fixes it beyond question in another.

It is the place, not the local laws, that becomes of paramount importance in determining the question of domicil. Where, not under what laws, do the animus et factum concur?

From reason and necessity it has been declared that all estates must be referred to some locality. For the purpose of making the place definite and certain, it has been established as a rule of law that it shall be the soil where, at the time of decease, a person has a permanent abode, without any intention of removing therefrom.

Ordinarily, if a person has left his domicil of origin and selected another locality, whether in another State or a foreign country, in which his home is located and his business established, without any intention of leaving, that locality is his domicil.

Although a person may have abandoned his domicil of origin so far as his acts or intentions were concerned, yet if he was prevented by law from acquiring a domicil of choice then his domicil of testacy or intestacy would continue from necessity to be his domicil of origin.

In order to establish a domicil of choice evidence of three important facts must appear: 1. Abandonment of domicil of origin. 2. Selection of a new locus. 3. Animus manendi or the intention of remaining. Technically, proof of the selection of a new locus and of the intention of remaining necessarily establish the abandonment of the domicil of origin.

The domicil of a person, living in a country that has granted extraterritorial privileges, should be determined by the same rules of law that apply to the acquisition of domicil in other countries.

A Chinese domicil gives a decedent's estate a fixed place of abode and subjects it to the law governing the locality. Whether American Law or Chinese law it is, nevertheless, the law of the place, as to American citizens.

The effect of declaring domicil upon Chinese soil would be precisely the same, whether the law governing the locus was Chinese or American. In either case, it would be the law that covered that particular locality with respect to Americans, and, as to them, would become the local law.

In this enlightened age the doctrine of immiscibility cannot be accorded such weight as to establish a legal presumption against all other evidence tending to prove animus. In American jurisprudence, at least, it should be allowed to slumber with Quaker persecution, Salem witchcraft and other

kindred dogmas. Since the dictum of immiscibility was first declared, the world has experienced a revolution touching the national, commercial and trade relations between the nations of the East and those of the West.

A person whose domicil of origin is in the State of Maine can as a matter of law acquire a domicil of choice in the Province of Shanghai, China, a place where, by treaty, American law is substituted for the Chinese local laws.

The decedent, Henry H. Cunningham, was born in 1838, in Waldo County, Maine, of parents who were citizens of the State of Maine and resident and domiciled in said county of Waldo. His parents continued to reside in said county until 1865 when they removed to Virginia. From the time of his birth he continuously resided in said county with his parents until May 3, 1853, the last three years being at Belfast in said county. In May, 1853, he went to sea. In 1854 he went to Australia. About 1857, he was for a time a pilot on the river at Shanghai, China. The only time he was in Waldo County from the time he left it in 1853 to the time of his death was in 1866 when he returned to visit his parents only to find that they had changed their residence to Virginia. He then had neither property nor relatives left in Waldo County. From 1869 to the date of his death, he made his home, established his business and had his headquarters in Shanghai. He was never married and at the time of his death his only heirs and next of kin were two brothers and two sisters. He died at Shanghai, June 10, 1905, leaving an estate of personal property valued at over $50,000. He left a will, executed in the presence of two witnesses, in which he undertook to dispose of his estate. After his death, proceedings for the probate of the will were had before the United States Consul at Shanghai, the will was duly allowed, settlement and distribution of the estate made, and the various legatees named in the will received their distributive shares through the methods usually observed in the Consular Court at Shanghai in the settlement and distribution of similar estates. Afterwards the two brothers of the decedent filed a petition in the Probate Court, Waldo County, Maine, for administration of the estate of the decedent as intestate property, contending (1) that the Consular Court at Shanghai had no authority to settle and distribute the estate of the decedent, upon the ground that the decedent had never acquired a domicil in Shanghai but that his domicil continued during all the years of his absence to be in Waldo County, Maine; (2) That the will was not executed in accordance with the laws of Maine, having but two witnesses; (3) that his estate should be administered in Maine as intestate property.

*Held:* That the decedent, at the time of his decease, had abandoned his domicil of origin in Waldo County, Maine, and had acquired a domicil of choice in Shanghai, China, and that consequently the Probate Court in Maine had no jurisdiction of his estate.

On report. Appeal from decree of Probate Court. Sustained.

Appeal from the decree of the Probate Court, Waldo County, appointing Albert W. Cunningham administrator of the estate of

his brother, Henry H. Cunningham, deceased, who died in Shanghai, China, June 10, 1905, and who for many years next prior to his decease was a resident of Shanghai.

The appeal was heard at the April term, 1908, of the Supreme Judicial Court, in said county, sitting as the Supreme Court of Probate. At the conclusion of the evidence then presented some of which was in the form of admissions, the presiding Justice made the following order: "This case having come on to be heard by me at the April Term of the Supreme Judicial Court in Waldo County, I, the undersigned Justice, being of opinion that questions of law are involved of sufficient importance and doubt to justify the same and the parties agreeing thereto, the same is reported to the Law Court, and upon so much of the foregoing admissions and evidence as is legally admissible, together with the evidence to be taken by Lottie E. Lawry, commissioner appointed by the Court for that purpose, the Law Court is to determine the rights of the parties."

The case is stated in the opinion.

The allegations in the petition for administration filed in the Probate Court, Waldo County, are as follows:

"Respectfully represents Edward R. Cunningham of Washington, D. C., and Albert W. Cunningham, of Rockland, in Knox County, that Henry H. Cunningham who last dwelt in Belfast, in said County of Waldo, died on the 10th day of June, A. D. 1905, in Shanghai, China, intestate; that he left estate to be administered, to wit: personal estate to the amount of at least twenty dollars: that your petitioners are interested in said estate as heirs at law and next of kin; that said deceased left no widow, whose name is                     and as his only heirs-at-law and next of kin, the persons whose names, residences and relationship to the deceased are as follows:

| "Name | Residence | Relationship |
|---|---|---|
| "Edward R. Cunningham, | of Washington, D. C., | Brother |
| Albert W. Cunningham, | Rockland, Me., | Brother |
| Helen E. Berry, | Rockland, Me., | Sister |
| Mrs. A. C. Mather, | Rockland, Me. | Sister" |

The "Reasons of Appeal" are as follows :

"1.    Because the Probate Court in and for the County of Waldo had no jurisdiction in the premises.

"2.    Because upon the allegations in the petition on which said decree was founded, that said Cunningham last dwelt in Belfast in said County, said Probate Court had no jurisdiction.

"3.    Because said Probate Court had no jurisdiction to appoint an administrator upon the estate of said Henry H. Cunningham for the reason that said Cunningham was not at the time of his death either an inhabitant or a resident of the County of Waldo ; did not leave personal estate to be administered in said County ; did not leave debts to any amount, and did not own any real estate in said County, and none of his estate was afterwards found therein.

"4.    Because the facts set out in said petition upon which the jurisdiction and action of said Court are predicated, viz :    that the said Henry H. Cunningham last dwelt in said Belfast and that there was at the time of filing said petition any estate of said Cunningham to be administered, are false and contrary to fact, and were well known by the petitioners asking for such decree so to be.

"5.    Because said Henry H. Cunningham was not at the time of his decease a resident or inhabitant of said Belfast, but was a resident and inhabitant of Shanghai, China.

"6.    Because there was no personal estate of said Henry H. Cunningham at the time of filing said petition to be administered.

"7.    Because the estate of said Henry H. Cunningham had, prior to the filing of said petition, been entirely settled and closed up and the estate distributed, by a competent court having jurisdiction thereof under the Constitution and laws of the United States, to wit, the Consular Court of said Shanghai, China, by the action of which Court all parties interested therein were bound and concluded.

"8.    Because any jurisdiction assumed by said Probate Court or by the Supreme Court of Probate is in conflict with and in violation of the Constitution and Laws of the United States, and draws in question the validity of the action and authority of the Consular Court of said Shanghai, exercised under and by virtue of the authority of the Constitution and Laws of the United States, the

last will and testament of said Cunningham having been duly proved, allowed and settled, and his estate distributed thereunder by said Consular Court by virtue of said authority by which acts all parties interested are bound and concluded.

"9. Because said Henry H. Cunningham, a citizen of the United States but domiciled, residing and being an inhabitant of Shanghai, China, died abroad, to wit, at said Shanghai, and by lawful testamentary disposition appointed one E. H. Dunning to take charge of and manage all of his property, and gave special directions in relation thereto, and all the property of said Cunningham was by virtue of the laws of Congress applicable thereto, taken possession of, managed and disposed of by the said Dunning in accordance with said directions and there is, and was at the time of taking out of said administration, no property of the said Cunningham remaining, and over the property so disposed of by said Dunning under said directions, this Court has and can exercise no jurisdiction.

"10. Because said Henry H. Cunningham left a last will and testament and named an executor therein."

The will of the decedent is dated at "Shanghai, June 13, 1900," and was executed in the presence of two witnesses only, and begins as follows: "This is the last will of me Henry H. Cunningham, of Belfast, Maine, U. S. A. and residing in Shanghai, China."

*Littlefield & Littlefield (of the New York Bar,) and Arthur S. Littlefield,* for plaintiffs.

*W. Henry White (of the Washington, D. C. Bar,) and Dunton & Morse,* for defendants.

SITTING: EMERY, C. J., WHITEHOUSE, SAVAGE, SPEAR, CORNISH, BIRD, JJ.

SPEAR, J. This is an appeal from the decree of the Probate Court for Waldo County, dated September 11, 1906, appointing Albert W. Cunningham administrator of the estate of Henry H. Cunningham, deceased, and comes here on report. The agreed facts show that Henry H. Cunningham was born in 1838 in Swan-

ville, county of Waldo, Maine, of parents who were citizens of the State of Maine and resident and domiciled in said county and State. His parents continued to reside in Waldo County, Maine, until 1865, when they removed to Manassas, Virginia. He resided with his parents in Waldo County in this State continuously from his birth until May 3, 1853, the last three years at Belfast, Maine. In May, 1853, at the age of fifteen he went to sea. In 1854 he went to Australia. About 1857 he was for a time a pilot on the river at Shanghai, China. He was never married and at the time of his death his only heirs and next of kin were two brothers and two sisters. He died at Shanghai June 10th, 1905, leaving an estate of personal property valued at over $50,000. He left a will in which he undertook to dispose of his estate, executed in the presence of two witnesses. After his death proceedings were had before the United States Consul at Shanghai, China, for the settlement and distribution of his estate, and the various legatees have received their distributive shares through the method usually observed there in the settlement and distribution of similar estates. The appellees, however, deny the right of the consular court at Shanghai to thus settle and distribute the estate of the decedent, upon the ground that he had never acquired a domicil in Shanghai; that his domicil continued during all the years of his absence to be in Waldo County; that his will was not executed in accordance with the laws of Maine, having but two witnesses; and that his estate should be administered here as intestate property. Consequently they applied to the Probate Court for the county of Waldo for the appointment of an administrator to settle the estate. The appointment was made, from the decree of which the appeal before us was taken.

It therefore appears that but two issues, one of fact and one of law, are involved in the determination of this case. Each presents the same question: Did the decedent have a domicil in Shanghai at the date of his death, (1) as a matter of fact, (2) as a matter of law? The burden is upon the appellants to establish the affirmative of both issues. *In re Tootal's Trusts*, 23 Ch. Div. 532. We will first proceed to the issue of fact. Assuming, arguendo, that the

decedent could acquire a legal domicil in Shanghai, do the necessary facts appear to support this conclusion? Domicil may be established in different ways, but two of which are involved in this case, domicil of origin and domicil of choice. It is conceded that the decedent had a domicil of origin in Waldo County. That domicil continued, whatever the wanderings of the decedent, until he acquired a new one in some other locality. In order to establish a domicil of choice evidence of three important facts must appear, (1) abandonment of domicil of origin, (2) selection of a new locus; (3) the animus manendi. Technically proof of (2) and (3) necessarily establish (1). Putting these facts in the form of a definition, *Gilman* v. *Gilman*, 52 Maine, 165, says: "Domicil is said to be the habitation fixed in any place, without any present intention of removing therefrom." While the term domicil seems to possess more or less elasticity there can be but one domicil of testacy or intestacy. It is the latter sense in which it will be here treated.

We deem it unnecessary to consume much time in discussing the questions of fact. The evidence shows that the decedent was in Waldo County but once from the time he left it to the time of his death. In 1866 he returned to visit his father and mother, only to find that they had changed their residence to the State of Virginia. He had now neither property nor relatives left in this county. That he abandoned, and intended to abandon, his domicil of origin, is too apparent to require comment. It is also established that he made his home, established his business and had his headquarters, from 1869 to the date of his death, in Shanghai, China. In fact, the evidence in the case does not tend to show that during these years he permanently resided at any other place. We therefore find no trouble in determining that he selected Shanghai as his place of business and residence after 1869. While there is more or less conflict in the testimony respecting his intention to remain in Shanghai indefinitely, it cannot be reasonably declared upon the evidence, that he had any present intention of removing from Shanghai or of coming back to the State of Maine. In other words, the court is of the opinion that had Henry H. Cunningham resided in England, France, or any State in the Union, from the time he

left Belfast until the date of his death, under precisely the same circumstances that are found in connection with his residence at Shanghai, it would clearly appear that he had acquired a domicil of choice in either one of these localities where he had so resided. *Harvard College* v. *Gore*, 5 Pick. 369. The animus et factum concurred and the forum novum was substituted for the forum originis.

The facts being sufficient to establish the domicil of the decedent upon the soil of any foreign country, including that part of China not affected by treaty relations, we now come to a new and more difficult problem : Can an American under any circumstances, whatever the facts, acquire, as a matter of law, a domicil in the Province of Shanghai, China, a place where, by treaty, American law is substituted for the Chinese local laws? Although the decedent may have abandoned his domicil of origin, so far as his acts and intentions were concerned, yet it is conceded, if he was prevented by law from acquiring a domicil of choice, that his domicil of testacy or intestacy would continue from necessity to be that of origin. Therefore the case finally turns upon the question, whether the decedent could, as a matter of law, acquire a domicil in Shanghai. This proposition raises two important questions: First, whether any good reason can be adduced from all the circumstances of the case why the usual law of domicil should not be applied to the decedent's residence in Shanghai. Second, whether any decision or rule of law, admitting all the facts of domicil, intervenes to inhibit the acquisition of such domicil. The first question involves, in limine, the effect upon the government and territory of Shanghai of the treaty relations between this country and China. These relations have been so clearly expressed in the English case, *In re Tootal's Trusts*, that we adopt the following paragraph as a statement of their character. "The treaties do not contain any cession of territory so far as relates to Shanghai and the effect of them is to confer in favor of British subjects special exemptions from the original territory jurisdictions of the Emperor of China and to permit them to enjoy their own laws at a specified place. Similar treaties exist in favor of other European govern-

ments and the United States." Of course laws have been enacted
by all the governments, including our own, to carry into effect
upon the territory involved the treaty relations of the parties to the
convention, but the broad fact that the treaty territory is exempt
from local law, and under the rule of foreign law, raises all the
questions that can effect the establishment of domicil upon treaty
soil. We need not then inquire concerning the acts of Congress.
To this situation is to be applied the law of domicil, its meaning,
the reasons for it, its purpose.

To apply the law correctly we must first determine precisely what
we mean by the term "domicil." While it is asserted in some courts
that there may be two or more domicils, it is yet true that there can
be but one governing the settlement of estates. We have already
referred to the elements of domicil, the animus et factum, but have
not determined whether they must concur with reference to a
community, or with reference to a locality, in order to establish
domicil; but we are clearly of the opinion that domicil in no case
can be asserted, independent of locality. It expresses but little
relation to society or community. As was said in *Harvard College*
v. *Gore*, 5 Pick. 369, "The term inhabitant, as used in our laws
and in this statute means something more than a person having a
domicil. It imports citizenship and municipal relations, whereas a
man may have a domicil in a country to which he is alien and where
he has no political relations. As if an American citizen should go
to London or Paris with an intention to remain there in business
for the rest of his life, or if an English or French subject should
-come here with the same intention, they would respectively acquire
a domicil in the country in which they should so live, but would
have no political relations except that of local allegiance to such
country." It was also said in *Tootal's Trust*: "The idea of domi-
cil, independent of locality, and arising simply from membership of a
privileged society, is not reconcilable with the numerous definitions
of domicil, to be found in the books. In most, if not all of those
from the Roman code to Storey's Conflict, domicil is defined as a
locality,—as the place where a man is, his principal establishment,
the true home. But it is useless to pursue the topic farther. Their

lordships are satisfied that there is neither principle nor authority for holding that there is such a thing as domicil arising from society and not connected with a locality." This conclusion is in full harmony with the well settled doctrine in this country. That is, ordinarily speaking, if a person has left his domicil of origin and selected another locality, whether in another State or a foreign country in which his home is located and his business established, without any intention of leaving, that locality is his domicil. It therefore appears that "domicil" in its usual sense does not present a complex or difficult problem. Ordinarily it is a pure question of fact, as was said in *Thorndike* v. *City of Boston*, 1 Met. 242, "No exact definition can be given of domicil. It depends upon no one fact or continuation of circumstances, but from the whole taken together which must be determined in each particular case. It is a maxim that every man must have a domicil somewhere, and also that he can have but one. It follows that his existing domicil continues until he acquires another and, vice versa, by acquiring a new domicil he relinquishes his former one. Very slight circumstances must often decide the question. It depends upon the preponderance of the evidence in favor of two or more places, and it often appears that the evidence of facts tending to establish a domicil in one place would be entirely conclusive were it not for the existence of facts and circumstances of a still more conclusive and decisive character which fixes it beyond question in another." Therefore it is plain that it is the place, not the local laws, that becomes of paramount importance in determining the question of domicil. Where, not under what laws, do the animus et factum concur?

There are now forty-seven States in the Union, nearly all differing in some respects with reference to the laws of descent, the right of inheritance and the distribution of estates but, in whatever State the decedent may be found, to determine his domicil, no inquiry is made as to what laws shall govern the settlement of his estate, but where did he have a permanent abode. The same is true of the laws of Great Britain. England, Scotland, Ireland and Wales each has its own peculiar laws governing the descent and distribution of

property, yet these laws are never consulted upon the question of domicil. The place is the issue as will appear by a reference to the *Dr. Munroe case,* 5 Maddock.

Now then if the true legal meaning of domicil is to fix a locality, what is the reason for the law? Why may not an estate be settled wherever the owner happens to decease? The reason is manifest. It is to establish stability and certainty with respect to the place where estates are to be settled. Otherwise, great confusion and numerous difficulties might follow an attempt to settle estates in distant localities in which the decedent might happen to temporarily reside. It has, therefore, from reason and necessity, been declared that all estates must be referred to some locality. For the purpose of making the place definite and certain, it has been established as a rule of law that it shall be the soil where, at the time of decease, a person has a permanent abode, without any intention of removing therefrom. While the determination of domicil refers the settlement of an estate to a particular locality, it necessarily subjects it to the laws of that locality; but the underlying reason for the law of domicil is not to subject an estate to any particular law, but to fix its abode.

But it is forcibly urged that the term domicil necessarily implies subjection and obedience to the local laws, and that this cannot be said to be true of a residence in Shanghai. The first part of the proposition is admitted, but the conclusion is not conceded. No good reason appears in support of it. What is meant by local laws? Undoubtedly that code of laws which governs the affairs of a certain prescribed jurisdiction. The laws of Maine are limited in authority to the territory of Maine. They have no force beyond the State line. They are strictly local. The same is true of the jurisdictional limitations of every foreign state. That is, the local laws are considered to be limited to the territory over which their jurisdiction extends. The ownership of the soil, therefore, controls the establishment of all local laws. Without consent of the owner, no extra-territorial law can be enacted within an independent jurisdiction, or extended to it. China is independent. It never released its ownership to the soil of Shanghai. Its sovereignty over its territory was

VOL. CV 22

retained.    In *Tootal's Trusts* it is said :  "The sovereignty over the
soil of Shanghai remains vested in the Emperor of China with this
exception, that he has by treaty bound himself to permit British
subjects to reside at the place for the purposes of commerce only
without interference on his part, and to permit the British Crown
to exercise jurisdiction there over its own subjects but over no other
persons."    This description applies equally to the American treaty.
Therefore whatever laws may have been extended by Congress to
the Province of Shanghai are operative, not upon American soil,
but upon the territory of the Chinese Empire.    How do these laws
reach there?    By treaty, permission of the Emperor.

Now it will probably be admitted, that, had the Emperor
extended by edict to this territory the identical enactments now
governing Americans residing there, a Chinese domicil could be
acquired under the laws thus promulgated.    It is true that, instead
of an edict declaring the law, the Emperor by consent permitted
Congress to extend its statutes to the government of Americans in
this treaty port.    In other words, if the identical laws which now
govern Americans upon this territory had been promulgated by
edict, instead of permitted by treaty, the estate of the decedent
would, without question, have been conceded a domicil in Shanghai.
Now then as a practical question what logical reason can be given
for declaring the existence of domicil in the one case and not in the
other?    The decedent would have lived under precisely the same
laws and upon the same foreign soil.    Although the Emperor had
suspended some of the Chinese laws and permitted the extension of
American law to the territory, yet the source of the law was the
Emperor who had never released his sovereignty over the soil.

Upon this point we quote from an able article in The Law
Quarterly Review, Vol. XXIV, page 444, by Prof. Huberich of
Stanford University.    In his analysis of Mr. Justice Chitty's
opinion in *Tootal's Trusts*, he says :   "It is quite immaterial that
the Chinese law provides that persons of British nationality shall be
governed by the rules of law prevailing in England, or by such
laws as may be enacted and made applicable to them by the English
authorities.    The English law is operative in Shanghai as to certain

persons and certain transactions only because it is permitted and adopted by the territorial sovereign."

The effect, also, of declaring domicil upon Chinese soil would· be precisely the same, whether the law governing the locus was Chinese or American. In either case, it would be the law that covered that particular locality with respect to Americans, and, as to them, would become the local law.

It would appear, then, that the only reason assigned for withholding from the decedent the right of Chinese domicil is that, while he lived upon Chinese soil, under Chinese sovereignty, he was subject to laws extended to the particular territory by treaty instead of by edict. We are able to discover neither logic nor reason for the distinction here suggested. The fundamental idea of domicil does not depend upon any distinction with respect to the source of the local law. A Chinese domicil gives the decedent's estate a fixed place of abode and subjects it to the law governing the locality. Whether American law or Chinese law, it is, nevertheless, the law of the place, as to American citizens.

Prof. Huberich states it this way : "Where the requisite factum and animus are shown to exist there is no valid reason why an Englishman or an American should not be held to acquire a domicil in China. In respect of all matters which private international law refers to the law of the domicil he would be governed by the Chinese law, the law of the territorial sovereign. The law to which he would be subject would be none the less the law of China because it provides that persons of British and American nationality shall be governed by such laws as their respective countries may enact to govern their nationals in China."

In the case before us the effect of denying a Chinese domicil absolutely defeats the will of the testator and diverts the transmission of his property into unintended and perhaps objectionable channels.

On the other hand no inequitable result can be reasonably predicated upon the declaration of such domicil. No injury can follow. The estate, if testate, is disposed of in accordance with the terms of the will, precisely as it would be here. That the will was attested

by but two witnesses instead of three, as required in Maine, is immaterial to the issue. *Lyon* v. *Ogden*, 85 Maine, 374. If intestate, the property of the estate is legally administered, as appears from the opinion of L. R. Wilfley, Judge of the United States Court for China, decided May 15th, 1907, in the matter of the Probate of the will of John Pratt Roberts. In this connection it may be proper to add that the record shows that one hundred and eight estates, testate and intestate, have been administered through the consular court at Shanghai since 1865.

In fine, in considering the reasons why the American law of domicil should not apply to American nationals in Shanghai, under the circumstances of this case, the court is unable to discover any substantial objection, nor has any been pointed out in any cited case. Jacobs on Domicil, section 361, in a brief summary of his analysis of Justice Chitty's opinion, *In re Tootal's Trusts*, pertinently suggests that no reasons are assigned even in this case which, by dictum, squarely denies the right of Chinese domicil. Section 361 reads: "Here, then, we have, according to the uncontradicted evidence, (1) complete abandonment of English domicil of origin, and (2) residence in China with intention to remain there permanently. If this case is to be accepted as an authority upon this point, therefore, something more is necessary for the establishment by an American or a European of his domicil in a country in which European civilization does not prevail, than abandonment of his domicil of origin, and mere residence with intention to remain permanently. What more is necessary has never been pointed out, although, doubtless, as Dr. Lushington intimates, a change of religion would be deemed sufficient."

The suggestion hinted at by the author, touching the effect of religion upon the domicil of American and European nationals in the East, is based upon a dictum in a passage found in the *Indian Chief*, 3 C. Rob. A. D. 29, in which Lord Stowell says: "In the western parts of the world alien merchants mix in the society of the natives; access and intermixture are permitted; and they become incorporated to almost the full extent; but in the East, from the oldest times, an immiscible character has been kept up; foreigners

are not admitted into the general body and mass of the society of the nation; they continue strangers and sojourners as all their fathers were." Dicta of a similar import are found in *Maltass* v. *Maltass*, 1 Rob. Eccl. 67-80, and *In re Tootal's Trusts*.

In the cases cited the doctrine of immiscibility applies both to presumptions of law and fact. Mr. Justice Chitty in *Tootal's Trusts* defines the doctrine as follows: "The difference between the law, manners and customs of Chinese and Englishmen is so great as to raise every presumption against such a domicil." That is, an American may marry a Chinese woman, establish his business upon Chinese soil, accumulate a fortune there, raise a family and declare his intentions of ever remaining, yet the influence of religion and customs of the community in which he has chosen to live and die is presumed to be so repugnant to the idea of Western civilization as to rebut all evidence of intention however conclusive. The opinion of the learned Justice, however, concedes that if the strong presumption against intention could be overcome a domicil of choice in China might be acquired. We think it can be overcome.

In this enlightened age the doctrine of immiscibility cannot be accorded such weight as to establish a legal presumption against all other evidence tending to prove animus. In American jurisprudence, at least, it should be allowed to slumber with Quaker persecution, Salem witchcraft and other kindred dogmas. Since the dictum of immiscibility was first declared, the world has experienced a revolution touching the national, commercial and trade relations between the nations of the East and those of the West. Our conclusion, therefore, upon the first proposition is that no sound reason can be adduced against the practical application of the American law of domicil to Americans residing in China, when the animus et factum are found to concur.

This brings us to the second general proposition involved in the discussion: Is there any established principle of law which intervenes to prevent the practical application of the rules of American law of domicil to Americans residing in China? This precise point, so far as we are able to discover, has never been decided by any court of last resort. It has, however, been recently discussed and

decided in the negative by L. R. Wilfley, Judge of the United States Court at Shanghai, China.

The leading authority upon this issue is the English case, *In re Tootal's Trusts*, decided in 1883 in an opinion by Mr. Justice Chitty. It is, perhaps, fair to say that while the decision upon the point was pure dictum, it nevertheless, in legal effect, denies the possibility of a domicil of choice by a British subject. The issue presented to the court in this case involved the question of an Anglo-Chinese domicil. The real issue as stated by Mr. Justice Chitty is: "On principle, then, can an Anglo-Chinese domicil be established." Following the analogy of the early English cases, establishing an Anglo-Indian domicil for English subjects, residing in India, as members of the old East India Company, it was urged that an Anglo-Chinese domicil might be established for Tootal, an English subject who had lived in China with the animus et factum required to establish domicil; therefore the direct issue of Chinese domicil was not involved, and the case is not discussed by the learned Justice from that standpoint, as appears from the following quotation from his opinion: "In these circumstances it was admitted by the petitioners' counsel that they could not contend that the testator's domicil was Chinese. This admission was rightly made. The difference between the religion, laws, manners and customs of the Chinese and of Englishmen is so great as to raise every presumption against such a domicil, and brings the case within the principles laid down by Lord Stowell in his celebrated judgment in the *Indian Chief*, 3 Rob. Adm. 29, and by Dr. Lushington in *Maltass* v. *Maltass*, 1 Rob. Ecc. 67, 80, 81." From this paragraph it will be observed that the question of Chinese domicil was, by express admission of counsel, eliminated from the case. The discussion after this admission, was upon a question not in issue, and necessarily pure dictum, as it was not in any sense essential to the decision of the case. But the statement of Mr. Justice Chitty immediately following this admission, is the remark upon which he has established the legal impossibility of acquiring a Chinese domicil, and is therefore founded upon dictum, and dictum alone.

In the *Indian Chief case*, Lord Stowell was considering the question of the condemnation of a ship and cargo. The ship was charged with the offense of trading with the public enemy. The case involved the question of enemy character as determined by residence and protection. The determination of these questions did not in any sense involve the capacity of either party to acquire a residence in a foreign country. Yet upon these facts is based the opinion of Lord Stowell in which he speaks of the "immiscibility" of character in the paragraph already quoted as a reason why an Eastern domicil cannot be acquired by a British subject, and to which Mr. Justice Chitty alludes as a precedent for his conclusion. In *Maltass* v. *Maltass*, decided by Dr. Lushington, the question was as to the rule that should govern the descent of the personal property of John Maltass who died in Smyrna. One of the questions discussed was whether the testator had acquired a residence in Smyrna, he having had a domicil of origin in Great Britain. While this question was alluded to it is apparent from a most cursory examination that the question of domicil was in no sense involved in the case. With reference to the question of domicil the court summed up its conclusions as follows:

"I wish to observe that I am desirous not to be supposed to have given an opinion upon any question not necessary to be decided in this case; my judgment therefore does not affect the question of domicil."

"I give no opinion therefore, whether a British subject can or cannot acquire a Turkish domicil; but this I must say—I think every presumption is against the intention of British Christian subject voluntarily becoming domiciled in the dominions of the Porte." Yet the last part of this paragraph is the passage cited as a precedent.

It is obvious then that the extracts cited from these cases as precedents are, themselves, pure dicta. It as manifestly follows that Mr. Justice Chitty's discussion upon the question of Chinese domicil, was not only dictum, itself, but founded upon dictum. The cases therefore upon which he relies for his conclusion by no means justify the statement that "the difference between the religion, laws, and

manners of the Chinese and of Englishmen is so great as to raise every presumption against such a domicil," and *Tootal's Trusts* cannot be regarded as an authority for denying, as a presumption of law, the competency of acquiring a Chinese domicil.

We agree, however, with Mr. Justice Chitty upon the real issue before him for decision. An Anglo-Chinese domicil would certainly be of immiscible character. The Anglo-Indian domicil was so regarded by Mr. Justice Chitty, himself, who says of the cases establishing the doctrine "these authorities are generally admitted to be anomalous." While they may be regarded as anomalous in an attempt to establish a double domicil, a thing unknown to any rule of law and impossible in practice, they may be made, by a fair analysis, precedents in fact if not in name, for a straight Indian domicil in the anomalous cases considered, and for a straight Chinese domicil in the case at bar.

In its practical application, what does Anglo-Indian mean? It is simply the invention of a name. No new feature, except the name appeared in any of these cases that did not comport with all the general rules of acquiring a domicil in India. In alluding to this compound domicil Baggallay, L. J., *In ex parte Cunningham*, *In re Mitchell*, 13 Q. B. Div. 418, remarks: "There are some anomalous cases in which a subject of the queen had entered into the service of the Old East India Company, and it was held that he had acquired what was called an Anglo-Indian domicil." The phrase, "What was called an Anglo-Indian domicil" is significant and disclosed that, in the mind of the learned Justice, no such domicil could be legally said to exist. It appears, as already stated, that the Anglo-Indian domicil was declared upon the ground that the East India Company was a permanent institution in India, and that those persons who entered its employ were, ipso facto, presumed to have abandoned their domicil of origin and to have become permanently located in India.

Cotton, L. J., in the same case, takes emphatic exception to the elements of fact which the old cases declare are capable of constituting an Anglo-Indian domicil. He says: "It is said that a Scotchman by entering the service of the East India Company acquired

an Anglo-Indian domicil. I take exception to the expression 'by entering the service' of the East India Company. The ground of the decision in those cases was that the officer was residing in India under circumstances which showed that he intended to abandon his domicil of origin, under circumstances which rendered it his duty to reside there permanently. It was not the entering the service, but the residence in India under circumstances which required him to remain there, which caused the change of domicil. This is really what was said by Wood, V. C., in *Forbes* v. *Forbes*, 'When an officer accepts a commission or employment, the duties of which necessarily require residence in India, and there is no stipulated period of service, and he proceeds to India accordingly, the law, from such circumstances, presumes an intention consistent with his duty, and holds his residence to be animo et facto in India." In other words the learned Justice eliminates the East India Company, which made whatever domicil was acquired, dependent, not upon the East India Company at all, but upon a permanent residence in India. But eliminating the East India Company eliminates the component, "Anglo," from Anglo-Indian and leaves the Indian domicil only. The logic of these cases is that Anglo-Indian was a misnomer, as duty cannot be considered superior to volition in power to fix intention.

On the other hand, the whole trend of modern authority is in opposition to the dictum advanced in *Tootal's Trusts.* Judge Wilfley of the United States Court for China sitting at Shanghai in 1907 in re Probate of the will of Young J. Allen announced a strong opinion in which he rejects the dictum in *Tootal's Trusts* and comes to a directly opposite conclusion. The facts in the case are very similar to those in the case at bar. After an elaborate and exhaustive review of the authorities and text writers, he comes to the conclusion, First: That there is nothing in the theory or practical operation of the law of extraterritoriality inconsistent with or repugnant to the application of the American law of domicil to American citizens residing in countries with which the United States has treaties of extraterritoriality."

Second, "That Dr. Young J. Allen having lived in China for a period of forty-seven years and having expressed his intention to live here permanently, thereby acquired an extraterritorial domicil in China; consequently this court in the administration of his estate will be guided by the law which Congress has extended to Americans in China which is the common law." We wish to say, however, that we do not agree with Judge Wilfley in employing the name "extraterritorial domicil." It appears to be inconsistent with the fundamental idea of domicil, which, as we have endeavored to show, is a relation between an individual and a particular locality or country. The fact that the law governing the particular locality is extraterritorial, does not make the domicil extraterritorial, since it is immaterial upon the question of domicil from what source the law is proclaimed, as before shown.

This same view is taken by Prof. Huberich in the article already alluded to in which he says: "The choice of the words 'extraterritorial domicil' is unfortunate in that it is likely to convey the idea of exemption from the laws of the territorial sovereign."

Sir Francis Piggott, Chief Justice of Honkong, in a recent work, expresses the opinion "that when the question is again raised it will be found that the principles established by the most recent cases necessitate a reconsideration of the law laid down on the subject by Mr. Justice Chitty." As a result of his discussion he further concluded:

"A man may set up his home in a Treaty Port, he may have banished forever the idea of returning to his native country, the animus manendi may be clear, without shadow of doubt; on the hypothesis, too, there is a body of law regulating the community. Why is it impossible then for the ordinary principles of the law to be applied, and for the personal relations of the permanent members of the community to come under that law permanently as the law of the domicil of their choice; of those who are born members of the community as the law of the domicil of their origin? . . . Linking these two propositions together, it is suggested that the inevitable result is a modification of Lord Watson's interpretation of the law of domicil referred to above on

the following lines:—The law which regulates a man's personal status must be that of the governing Power in whose dominions his intention is permanently to reside, or must be so recognized and established by that governing Power as to be in fact the law of the land." Lord Watson's interpretation was that domicil must be referred to locality and not to community.

Hall, a distinguished authority on International Law, in his work on "The Foreign Jurisdiction of the British Crown," also takes issue with the views expressed in *Tootal's Trusts* upon the ground of expediency, and says: "It is perhaps to be regretted that a change in the law is not made which a short order in Council could easily effect. Anglo-Oriental domicil has its reasonable, it may almost be said, its natural place." This suggestion clearly shows that, in the opinion of the learned author, the doctrine of immiscibility, which has been made the fundamental objection to the possibility of an Eastern domicil, should no longer be regarded as a potential reason for denying such domicil. He further says upon the question of expediency: "So long as persons have not identified themselves with the life of a new community, they must keep each his own law; but as soon as they have shown their wish and intention to cut themselves adrift from the association of birth, they prove their indifference to the personal law attendant on their domicil of origin; there is, therefore, no reason why simplicity and unity of law should not be gained for British subjects by attributing community in the laws of England to all of European blood. There is also every reason for avoiding very grave difficulties of another kind, which are opened through invariable preservation of the domicil of origin. English families, even in the present day, often remain through more than one generation in Oriental countries as their permanent place of abode; formerly the history of persons whose domicil might become a matter of importance was generally known sufficiently well; many are now of obscure antecedents and of an origin uncertain among the numerous places from which British subjects can derive. As no domicil can be acquired in an Anglo-Oriental community, it becomes every year more probable that cases will occur in which the determination of the domicil

of a father, perhaps of a grandfather, may become necessary, and in which it may be equally impracticable to impute an English domicil or to attribute any other with fair probability. It would be a great advantage that in such cases there should be a fixed rule which should correspond with the obvious facts, and that the courts, instead of searching with infinite trouble and expense for an ancestral domicil should be enabled to find that a domicil had been acquired in the Eastern country which carried with it the application of English law."

Prof. Huberich upon this point says: "The English view it is submitted, is based on erroneous conceptions of domicil and extra-territoriality. It is supported by the authority of a single case, (*Tootal's Trusts*), has been vigorously attacked, and may be repudiated by courts not bound by the precedent."

In reviewing Judge Wilfley's opinion, he says "The result of the case is correct."

Westlake, in his Private International Law, takes the same view, and points out the inconsistency of the opinion in which Mr. Justice Chitty declared: "There is no authority that I am aware of in English law that an individual can become domiciled as a member of a community which is not the community possessing the supreme or sovereign power," having said in the same connection "It may well be that a Hindoo or Mussleman sitting in British India and attaching himself to his own religious sect there would acquire an Anglo-Indian domicil." Westlake says: "The Hindoos or Mussle-mans are as little the supreme or territorial power in India as the English are such in China." This discrepancy serves to point out the complexities that arise in an attempt to deny or modify the application of the rational and established rules of law.

The theory of this opinion is in accordance with the application of the ordinary rules of law touching the question of domicil. We have found no difficulty and discover no error in referring the existence of domicil to locality. We allude to this matter for the purpose of avoiding any confusion which might arise in reading the text writers cited in connection with the opinion. While they all advocate the legal propriety of holding that an American national

or an English national may acquire a domicil in a treaty port, they suggest, if we interpret them correctly, that such a domicil may be referred to community rather than locality. The reference of Sir Francis Pigot to "a modification of Lord Watson's interpretation of the law of domicil" relates to this precise point. We concur in the result of their conclusions, but not in the method of reaching it.

Upon both reason and authority we are of the opinion that the domicil of the decedent living in a country that granted extraterritorial privileges, should be determined by the same rules of law that apply to the acquisition of domicil in other countries. In support of this position we refer to the reasons cogently and comprehensively expressed in Judge Wilfley's opinion. In the language of Prof. Huberich, the result here reached, it is submitted, "preserves intact the theory that domicil is a legal relation between an individual and a particular country, and involves a certain submission to the laws of such country as the laws of the territorial sovereign. It upholds the doctrine that each State is supreme over all persons and things within the territorial boundaries. It does away with an anomaly in the law of domicil, and enables the courts to recognize the legal existence of a domicil where the facts and intent ordinarily requisite are present."

The court is of the opinion that Henry H. Cunningham, the decedent, at the time of his decease, had abandoned his domicil of origin in Waldo county, Maine, and had acquired a domicil of choice in Shanghai, China ; therefore in accordance with the stipulations in the report, the entry must be,

*Appeal sustained.*
*Decree of the court below reversed.*