JAMES B. DUKE

*v.*

LILLIAN N. DUKE.

[Argued December 18th, 1905.   Decided December 21st, 1905.]

1. Under *P. L. 1902 p. 503 § 4 ¶ 1*, giving this court jurisdiction of a suit for divorce by reason of adultery, where the adultery was committed without the state and complainant and defendant, or either of them, resided in the state at the time of the adultery and at the time of filing of the bill or petition, an actual residence in the state of either party at the time specified is, according to our decisions, sufficient to give the court jurisdiction of the subject-matter and to enable the complainant or petitioner to acquire jurisdiction of the person of the defendant by a service outside the territorial limits of the state. *Quære.* Whether service out of the territorial limits will be held by the supreme court of the United States to give the court jurisdiction of the person of the defendant unless there be a matrimonial domicile in this state. See *Haddock* v. *Haddock, 201 U. S. 562.*

2. Though the question of want of jurisdiction of the person can be raised only by plea, and the benefit of it is lost by a general answer, the defence of lack of jurisdiction of the subject-matter need not be raised by plea, but may be set up in the answer to the merits.

3. The evidence in the cause *held* to be sufficient to establish a matrimonial domicile in this state at the time of the commission of the offence and the commencement of the suit.

On petition for divorce. Hearing on plea, by evidence in open court.

*Mr. Richard V. Lindabury* and *Mr. Alvah A. Clark,* for the petitioner.

*Mr. Chauncey G. Parker* and *Mr. Samuel Kalisch,* for the defendant.

PITNEY, V. C. (after hearing counsel for the defendant).

I do not care to hear you farther on the part of the petitioner.

This is a suit for divorce by a husband against his wife, commenced by petition, charging her with adultery, committed in various places in the city and State of New York.

It avers that the marriage took place in the State of New Jersey on the 29th of November, 1904, and that from that time up to the filing of the petition the parties have been and now are inhabitants and residents in this state.

The plea avers that the court has neither jurisdiction of the subject-matter nor of the person of the defendant, and alleges that the petitioner was not, at the time of the marriage, and has not been ever since, a resident of or a citizen of or domiciled in the State of New Jersey, but was a resident of and a citizen of and domiciled in the city of New York, and that the matrimonial domicile and residence of the parties was, at the time of the marriage, and thence until the commencement of the suit, in the State of New York, and not in the State of New Jersey.

The plea further sets up that the defendant was not served with process within the jurisdiction of this court and has not consented thereto, and that the proceedings are without due process of law.

The plea then invokes the provision of the constitution of the United States, forbidding any state to deprive any person of life, liberty or property without due process of law, &c.

The charge on the part of the defendant of lack of residence and domicile in New Jersey strikes at the jurisdiction of the subject-matter as well as of the person.

This appears when we consider that the subject of divorce is not within the general jurisdiction of a court of chancery.

In this state it is wholly statutory, and in this case comes under the second part of paragraph 1 of section 4 of the act concerning divorces (*P. L. 1902 p. 503*),

"where the adultery was committed without this state and the parties complainant and defendant, or either of them, resided in this state at the time of the adultery and at the time of filing the bill or petition."

If, then, the party petitioner or defendant resided in this state during the period covered by the petition herein, this court, by our statute, has jurisdiction of the subject-matter.

But in order to obtain jurisdiction of the person of the defendant by extraterritorial service of process, it is possible that something more than a mere residence is necessary.

I stop here to say that in order to raise the question of jurisdiction of the subject-matter it was not necessary for the defendant to plead as she has done. That defence may be, in my judgment, set up in her answer to the merits.

It is the lack of jurisdiction of the person that can be raised only by plea, and the benefit of which is lost by general answer.

According to all the authorities, in order to obtain jurisdiction of the person by extraterritorial service, there must be what is called a *res* within the territorial jurisdiction.

In fact there can be no decree strictly *in personam* based upon an extraterritorial service of process. But the court may deal with the rights of parties residing out of the territorial jurisdiction in matters such as land and personal chattels within its jurisdiction.

The foreclosure of mortgages, where the owner of the equity of redemption is not within the reach of domestic process, is an example.

So with the enforcement of debts by attachment against non-residents levied on their property within the territorial jurisdiction.

In cases of matrimonial offences, the *res* or matter within the territorial jurisdiction, which it has been held by the courts of all the states except New York, and finally by the supreme court

of the United States (reversing the court of appeals of New York), is sufficient to give the courts of a state jurisdiction to proceed against a non-resident on service out of the state, is the married state.

If the married state exists within the territorial jurisdiction, the court of that jurisdiction may proceed to deal with it by extraterritorial service on the absent party.

This arises out of the very necessity of the case, since, unless such jurisdiction could be exercised, the offending spouse who should be able to escape beyond the jurisdiction before service would thereby be able to deprive the other spouse of his or her just remedy.

By our statute a mere "residence" in the state is sufficient, and it has never been here determined, as I am aware, whether that residence must be or have been a matrimonial domicile— that is, whether it is necessary that the spouses should have had their joint home in this state—or rather, I should say, that it has been held in this state that it was not necessary that there should be a matrimonial domicile here.

But the supreme court of the United States has never, as I am aware, dealt with that precise question.

In the *Atherton Case,* in which they held extraterritorial service sufficient, there was a matrimonial domicile in Kentucky, and the service was in the State of New York.

However, in the present case, the petitioner, who assumed the burden of proof, very properly undertook to show a domicile as distinguished from a mere residence at the time of the marriage, and from thence until the separation.

He alleges that the county of Somerset, in this state, has been for several years before the marriage the chosen domicile of the petitioner, and that it continued to be such after the marriage until the separation, which, by the evidence presently to be mentioned, occurred some time in July of the present year. And he argues that in the absence of a separation the domicile of the husband is the domicile of the wife, wherever they may have been actually sojourning. And he avers that it was the actual residence of the wife for a portion of the time between the marriage and the separation.

One other remark before coming to the facts.

There may be a domicile without an actual present residence, and, *vice versa,* there may be a present residence without a domicile, as in the case of our foreign ministers, who reside abroad without losing their domicile in the United States, and our cabinet ministers and many of our members of congress, who reside in Washington, but are domiciled in their respective states.

Again, a man may have two or more residences, but only one domicile.

He may have a country residence and a city residence, and each with all the paraphernalia of a home. Such instances are very common, and then it becomes a matter of choice.

He chooses which one of the residences shall be his domicile and his choice is final if made in good faith, although he may spend less time at his domicile than at his residence.

Now, the marks of the domicile are numerous. They include the character of the place and the acts and declarations of the party in connection therewith; provided, of course, the declarations are made in good faith, sincerely and *ante litem molam.* In this country one of the most important indications of a domicile is the exercise of the electoral franchise.

Let us now look at the facts of this case, and that includes many years of the life of the petitioner.

He was born and bred in Durham, North Carolina, where his father was engaged in dealing in and manufacturing tobacco.

The petitioner was interested with his father as one of the firm of W. Duke's Sons & Company.

Twenty-one years ago, when he was twenty-eight years old, in the year 1884, he came to New York City and established a tobacco business there.

He was a bachelor from thence until his present marriage, and he lived in New York City from 1884 for ten years.

He never voted there.

His domicile of origin was, of course, in the State of North Carolina, and so remained until he determined to change it, and he had a right to retain that domicile although living in New York.

He admits that he did, as he supposed, change it some time before the end of the ten years, but he is unable to fix the date when he did change it to New York, if ever. At the same time, he was described in official and other documents as of the city of New York as early as the year 1890.

In the year 1893 he purchased the old Veghte farm, of three hundred acres, lying just south of the Raritan river, near Somerville.

On it was a large, old-fashioned mansion-house.

In the conveyance, as originally prepared, he is described as of Somerset county, but that description is erased and the words "New York City" inserted, so that we may conclude that at that time he considered his residence in New York, and had not finally determined to make Somerset county his home.

But in the year 1894 he moved the furniture of his suite of rooms in New York City to the old Veghte house and set up housekeeping there.

From that time on he has been described in all official and semi-official papers as of the county of Somerset, New Jersey.

He was the New Jersey director of the corporation or corporations in which he was interested.

He commenced directly from 1893 on to purchase more land, and from time to time for the next six or seven years bought several tracts of varying sizes, nearly every one adjoining some of the others, until he had acquired over seventeen hundred acres.

He was shortly after 1894 enrolled by the official canvasser as a voter in the township of Hillsboro, in the county of Somerset, and was thenceforward taxed yearly upon his poll.

He actually voted there in the years 1896, 1900 and 1904, when he was sent, by the congressional district of which Somerset county is a part, to the Republican convention in Chicago as a delegate.

He always spoke of that place as his home. He first repaired the Veghte house and set up a small home establishment. Later on he built a large and expensive addition to it, costing, as I recollect the evidence, some $50,000 or $60,000, erected in the most substantial manner, with all modern conveniences, with heating apparatus throughout, and with electric light.

He furnished it throughout, at an expense of over $60,000, with the most substantial and expensive articles, and hung its walls with oil paintings.

He established a corps of servants, with a regular house-keeper and several maids, and a man-of-all-work.

He provided a larder which was at all times supplied and ready to entertain himself and his guests without warning.

He built a stable, at an expense of $55,000, and installed it with horses and carriages, and later on with automobiles.

In short, the establishment had all the paraphernalia of a permanent home.

In the meantime he was spending enormous sums of money in beautifying the grounds, which were sufficient in acreage to make a parallelogram one mile wide and nearly three miles in length. These grounds he laid out in a park, with macadam drives, artificial lakes, water works to supply his house and buildings, and planted a great number of trees and shrubs, such as rhododendrons and other expensive plants.

Now, he swears that he all the time intended to make this his home.

We have, then, first, the buying of this property and the shaping it into a solid, substantial, elegant and expensive home, fitted for both summer and winter residence.

We have it furnished as such and provided with a house-keeper, corps of servants and a larder, always ready for him and his friends, when they came, including heat in winter.

We have him declaring over and over again to various individuals, when talking about the improvements he was making, that he was making a home for himself.

We have him making that his place of voting, and nowhere else, and we have him swearing that he always intended that as his home.

We have, further, no evidence that he had any other home besides that of his birth, unless it be in the city of New York.

The defendant alleges that all this time and up to the time of commencing this suit his real home and residence was in the city of New York.

Let us look what the proof is as to that.

Petitioner was an assiduous and attentive business man, and his business was mainly in the city of New York. It really extended all over the United States and the company of which he was and is the head had large factories and places of business in many of the large cities of the United States.

These were all managed, however, from the central office in the city of New York.

In that office petitioner spent most of his business hours when in the neighborhood of New York.

He usually, however, went out to Somerville on Friday evening, and sometimes, but not frequently, on Thursday evening, and remained over until Monday morning.

Sometimes he went out for a night in the middle of the week.

The proof satisfies me that he spent as many nights, in the course of the year, in Somerville as he did in the city of New York.

He gave as a reason for not spending all of his nights in Somerville that his business cares were so exacting that he could not afford to spend the time—about two hours in the morning and two at night—required to go from his place of business, on Fifth avenue, New York, to his farm, so he had a residence in the city of New York, where he could always go, and had a right to go.

He kept there horses and carriages and a coachman.

That residence was with the defendant, with whom he lived as his mistress.

I should not speak so plainly, but it was openly stated by her counsel, in his able and ingenious argument, and abundantly appeared by a letter, written by the petitioner to the defendant, in August, 1904, and offered in evidence by the defendant, in which he asked her to marry him and set at rest certain disagreeable rumors or scandals.

The connection with the defendant commenced in 1892.

He furnished her the money to buy a handsome and commodious house in a fashionable part of New York City, and also the money wherewith to furnish it, and there he always had a room and a home, if it be proper to call a residence like that, unsanctioned by marriage, a home.

Some two or three years before the marriage ceremony took place the defendant sold the house previously occupied by her, and, after a short vacation, purchased another—No. 11 West Sixty-eighth street—a fairly commodious house, costing over $40,000, and continued her residence there, and the petitioner went with her.

To each of these houses he carried a night latch key and came and went as he pleased.

On the 29th of November, 1904, the parties were married at the house of the defendant's aunt, in Camden, New Jersey, and immediately took steamer for Europe on a wedding trip, from which they returned the latter part of January, 1905.

Before their departure, however, wedding cards were sent out, in the name of the aunt, announcing the marriage of her niece, Mrs. Lillian Nannette McCready, to James Buchanan Duke.

With that announcement card was sent a card in the following words, "Mr. and Mrs. James B. Duke will be at home after the 1st of February, at 11 West 68th St., New York."

Counsel for defendant laid great stress on the use of that phrase *at home.*

It is proper to say that Mr. Duke disclaims all responsibility for it. He says it was some of his wife's foolishness.

But charging him with full responsibility for it, what, after all, does it mean? Why, simply that at that time and place they would be ready to see and receive visits from their friends.

It would have been quite as appropriate if it had been used to invite their friends to call on them at some hotel in San Francisco, or London, or Paris, where they found it convenient to be shortly after their marriage. For instance, it might have read, "Mr. and Mrs. James B. Duke at home at the Hotel Cecil, London, from the 1st to the 10th of February," or it would have been equally appropriate if the defendant had not owned or occupied a house in New York City, if they had made their *home* at the residence of Mr. Duke's brother, Benjamin N. Duke, which he then owned and shortly afterward occupied with his wife and two children in New York City.

In short, it has the same significance, and no more and no less, as the society phrase put in the mouth of the servant who

opens the door to a casual visitor and declares to that visitor that the lady of the house is not *at home,* and which is understood by everybody to mean simply, and no more, that she is not ready to receive visitors.

It does not necessarily refer to a domicile.

Reliance was also placed by counsel on an expression found in the letter before referred to, written by petitioner to defendant in August, 1904, and addressed to her at a hotel in the White mountains. He advises her to *come home.* When confronted with that letter he said he meant *her home,* and I think that is the proper construction to put upon it. Not being then married his Somerville home was not her home.

But let us look at the movements of the parties after their return, in January, 1905, to the United States from their wedding trip. They went together, first, to the Somerville house, and then to North Carolina, to visit his father. From there they went to Florida, then returned to the defendant's house in New York City.

The petitioner was, at or before that return, disabled with gangrene in his foot, and laid in bed, under the doctor's care, for six weeks, which brought them down to some time shortly after the 1st of May, when he took his wife out to his Somerville home, and they stayed there, off and on, until some time about the 1st of July, making their home there.

The defendant was indeed restless and desirous to get away; the petitioner was insisting on her making her home there. She threatened to go back to New York; he told her he would sell off his stable belongings there and cut her off from the use of the carriages; she said she would resort to livery; he said he would not pay the bills.

Just when they ceased to cohabit was not shown, but they never did cohabit after he sailed for Europe, on the 16th of July, 1905.

But in determining the value of the defendant's contention that, granting that petitioner's domicile was in Somerset county up to the time of the marriage, yet that it was then changed to New York City, another important and well established, and, in fact, admitted fact, is here to be noticed.

About the time of the marriage, and probably for some time before and after, the petitioner was entertaining the intention of building an elegant and costly mansion on the Somerville farm.

He was devising and studying plans for it.

He started on a half-million basis, and we all know what that means as to cost, and in all this his wife was consulted. And in the spring of 1905, when he was about to prepare the ground surrounding the site he had contemplated for this mansion, she was also consulted about that, and at her suggestion he changed the proposed site, and immediately put a large force of men, and I suppose machines, at work in grading and terracing for this new mansion.

When, if ever, this work was stopped, did not appear, as far as I at this moment recollect.

But, as before remarked, it is a well-established fact that while he was living with his wife on the farm—the place was called "Duke's Farm"—in the spring of 1905, he was actually engaged, at great expense, in preparing the ground for an elegant mansion for himself and his wife.

Now, this I consider a very important and significant circumstance, on the question of any change of intention on his part as to his domicile.

But the defendant does not stop there.

When the petitioner returned from Europe, in the latter part of August, 1905, just before the filing of the petition herein, he did not return to his wife's house, or, so far as appears, see her at all, but promptly set about providing a comfortable place and residence for himself in the city of New York.

His brother, Benjamin N. Duke, a wealthy gentleman, with a wife and two half-grown children, was the owner of a handsome house, in a fashionable neighborhood, which he had not yet occupied, or at least which was not fully furnished.

Petitioner immediately set about having that house furnished.

He brought in from Somerville, for the purpose of overseeing the placing of the furniture, his housekeeper, a very efficient woman.

10

He managed to entice away from his wife all, or nearly all, of her housemaids, and installed them in his brother's house.

Asked why he did this, he said he wished to find out from them how his wife had been behaving herself during his absence, and his object in promoting the establishment in his brother's house was manifestly to keep within his reach and control those servants.

Pressed, on cross-examination, he frankly stated that there was no bargain between him and his brother on the subject, but he had no doubt that his brother would sell him the house and furniture and whole establishment at any time he might wish it, but that all the expense attending the setting up of the establishment was borne by his brother, except the regular salary of his Somerville housekeeper.

This provision for a new residence in New York City was made after suit brought, and the house, when furnished and prepared for habitation, was occupied by his brother, Benjamin, and his wife and two children, and the petitioner had, as I understand the evidence, a comfortable resting place there, but he voted in Somerset county in the fall of this year.

He must have known—and he was all the while provided with the most able counsel—that anything in the way of a change of residence might be fatal to the success of his suit already instituted in the State of New Jersey, and I cannot think that he at that time seriously contemplated for even a moment abandoning his thoroughly established domicile in New Jersey for New York, and I infer from the evidence that this work of preparing his brother's house was all done after the filing of the petition, which was on the 2d of September.

Now, with regard to the facts that have been recited, it is proper to say that they are substantially undisputed, except some altogether trifling and immaterial disagreements in the evidence of the parties as to the household establishment at Duke's farm.

I recollect but two conflicts upon the real merits of the case.

Defendant swore that petitioner never intended to make his farm his home, but that he intended, after spending enormous sums in turning the greater part of his immense holding of

land into a beautiful private park, to make a present of it to the town of Somerville, or the county of Somerset, I forget at the moment which.

Now, the petitioner swears that he never heard of any ·such thing until he heard it from the defendant on the stand, and he denies her evidence in that respect *in toto*.

Now, I believe him, and not her.

I think her story falls as proof of its own weight. Neither the town of Somerville nor the county of Somerset have either the authority to accept such a gift or the power or financial ability to keep the park in order and properly maintain it, if accepted. The whole idea approaches the absurd.

The other matter is this: The defendant swore that the petitioner, during all these years, did not enjoy his visits to the farm, and did not enjoy remaining there any length of time, and declared that he did not like to be absent from New York even a few nights at a time.

Now, it would have been ungallant, to say the least, in petitioner not to express a desire to enjoy defendant's society continually, and as soon as the post-nuptial journeyings were over, and he had recovered from the long and serious disability which he suffered from his gangrene, he immediately transferred his wife to his Somerville home, and apparently tried to domesticate her there, where he could enjoy more of her society.

He testified that he had been very much confined by the exactions of his business relations, but that for the last year or two he had made such business arrangements as to enjoy more liberty and have more time at his command, and to be able to be more at his farm. This fits in with his determination to build there a modern palace for his home life with his wife.

Upon the whole, I conclude that the petitioner's domicile was for all these years in the State of New Jersey; that all his declarations in that respect were made in good faith; that whatever of a home he had in New York was not inconsistent with his actual domicile in New Jersey, and, granting that he had a residence in New York, he deliberately chose his domicile in New Jersey, and that choice was made in good faith at a time

when its importance and consequences were not of consequence to any then immediate interests.

I am further of the opinion that that domicile became, on their marriage, the domicile of the wife, as a presumption of law, and that it became such domicile in fact when, in the spring of 1905, he took her out there to live with him as his wife.

Thus we have here a matrimonial domicile actually existing up to at least a very short time before the commencement of the suit.

Hence I doubt if the question which I mentioned during the argument is raised by the circumstances of this case.

That question is whether, where spouses have their home in one state and there live together, and then separate, and one migrates to another state and there establishes a residence and a *quasi*-domicile which is not matrimonial, such residence or domicile will be sufficient, in the view of the supreme court of the United States, to create such a matrimonial status in that state as will justify the spouse so establishing it, and the state, in taking jurisdiction of the other spouse, not a resident in that state, by extraterritorial service of process.

That question, as far as I am at present informed, though thoroughly settled in this state; has never been dealt with by the supreme court of the United States.

It was on the supposition that this case, as finally developed, might raise that question, that I expressed the hope that it might be carried to the supreme court of the United States.

But while that question, if it had arisen, is one of great importance, because of the numerous cases in this country where spouses are called upon to answer each other's complaints by suits in jurisdictions thousands of miles away, in this particular case it is of little importance.

It seems to me that it makes little difference to the defendant whether she tries the merits of this case in New York or New Jersey. Indeed, I think the chances of actual justice are better in New Jersey than in New York, because there the issue must be tried before a jury all at one session, uninterrupted except by the hours of rest and holidays, and where either party is liable, especially in a case of this kind, to surprises in the matter of

evidence, but which might be, but cannot be, successfully met for want of time, while here hearings may be put over from day to day and time to time, till all the available evidence bearing on the issue has been produced.

It may be said that the infidelity is charged to have taken place in New York City, and hence the witnesses are naturally to be found there, but as the burden of proof is on the petitioner, that seems to me to furnish no cause of objection by the defendant, and whatever witnesses she may have in New York may be examined there, if unwilling to come to New Jersey.

There is no hint of lack of financial means on the part of the defendant to properly defend herself in this cause. If such lack of means exists, counsel for the defendant know how to remedy it.

I will advise a decree overruling the plea, and directing the defendant to answer within thirty days, and proper verbiage must be added to preserve her right to prosecute her appeal, notwithstanding her answer.