IN RE ESTATE OF EVAN JONES.

MARGARET ADAMS, Appellant, v. J. J. SMITH, Administrator, et al., Appellees.

**DESCENT AND DISTRIBUTION:** Personal Property—Domicile Controls. A domicile once acquired, in so far as it controls the descent of personal property, continues (1) until *actually* abandoned, and (2) until a new domicile is *actually* acquired. In other words, personal property will descend according to the laws of this state when the owner wholly abandons his domicile in this state and enters upon a journey to the land of his birth, with the intent there to take up his final residence, *and dies en route.*

*Appeal from Wapello District Court.*—C. W. VERMILION, Judge.

APRIL 7, 1921.

REHEARING DENIED OCTOBER 1, 1921.

PLAINTIFF claims that she is the illegitimate child of the decedent, Evan Jones, and as such is his sole heir, and entitled to his entire estate. The administrator of the estate is made a party, and also the brothers and sisters of the said decedent, who claim that the estate of the decedent descends to them. The court denied the plaintiff the relief sought, and she prosecutes this appeal.—*Reversed.*

*Jaques & Jaques* and *Gillies & Daugherty,* for appellant.

*J. J. Smith* and *Roberts & Webber,* for appellees.

FAVILLE, J.—The decedent, Evan Jones, was a native of Wales. When he was about 33 years of age, he came to America

as an immigrant. This was in 1883. He came over on the same ship with the wife and children of one David P. Jones. At that time, David P. Jones was living in Oskaloosa, Iowa, to which place the decedent went. After the death of David P. Jones, the decedent married his widow, who subsequently died, in January, 1914. The decedent, Evan Jones, was a coal miner, an industrious, hard-working, thrifty Welshman, who accumulated a considerable amount of property. In 1896, he was naturalized in the district court of Wapello County, Iowa, and thereafter voted at elections. The reason for his leaving Wales at the time he did was because of bastardy proceedings which had been instituted against him by the mother of the appellant. In 1915, the decedent disposed of his property, which then consisted of two farms and some city real estate. He was advised by his banker to leave the greater part of his money in a bank at Ottumwa until he got to Wales, and did so deposit it. He purchased a draft for about $2,000, and left some $20,000 on deposit in the bank, and also a note and mortgage for collection, and left with the banker the address of a sister in Wales, stating that he intended to live with said sister. He sailed from New York on May 1, 1915, on the ill-fated Lusitania, and was drowned when that boat was sunk by a German submarine on May 7, 1915. The Lusitania was a vessel of the Cunard line, flying the British flag. Thereafter, the brothers and sisters of the decedent secured the appointment of an administrator in Wapello County, Iowa. Various proceedings were had, which finally resulted in the trial of the issues in this cause.

I. The question for our determination in this case is whether or not, under the facts stated, the domicile of the decedent at the time of his death was in Wapello County, Iowa, or in Wales. If his domicile at the time that the Lusitania sank was legally in Wales, then it is conceded by all the parties that, under the laws of the British Empire, the appellant, as his illegitimate child, would have no interest in his estate. On the other hand, if the decedent at said time legally had his domicile in Wapello County, Iowa, then the property passed to the appellant as his sole heir, under the laws of this state.

For the purposes of the present discussion, it may be conceded that the evidence is sufficient to justify a finding that the

appellant was the child of the decedent, and had been so recognized and declared to such an extent as to satisfy the requirements of Code Section 3385.

It may also be conceded, for present purposes, that it is established by the evidence in the case that the decedent had, by acts and declarations, evidenced a purpose to leave his home in Iowa permanently, and to return to his native country, Wales, for the purpose of living there the remainder of his life.

The question of what constitutes domicile has often been passed upon by the courts, but the cases are so unlike in their facts that precedents to aid us in the determination of this precise question are difficult to find.

In *White v. Brown* (Pa.), 29 Fed. Cas. 982 (No. 17,538), Mr. Justice Grier well said:

"There are few subjects presented to courts for their decision which are surrounded with so many practical difficulties as questions of domicile."

The words "domicile" and "residence" are not always synonymous at law, nor are they convertible terms. *Ludlow Clark & Co. v. Szold,* 90 Iowa 175; *Mann v. Taylor,* 78 Iowa 355; *Fitzgerald v. Arel,* 63 Iowa 104; *Cohen v. Daniels,* 25 Iowa 88.

A person may have his residence in one place, while his domicile is in another. *In re Estate of Titterington,* 130 Iowa 356; *Fitzgerald v. Arel,* supra; *Cohen v. Daniels,* supra; *Love v. Cherry,* 24 Iowa 204.

A person may have more than one residence at the same time, but can have only one domicile, at least for purposes of succession. *Farrow v. Farrow,* 162 Iowa 87; *Savage v. Scott,* 45 Iowa 130; *Love v. Cherry,* supra.

It is well settled that every person, under all circumstances and conditions, must have a domicile somewhere. *Barhydt v. Cross,* 156 Iowa 271; *In re Estate of Titterington,* supra.

There are different kinds of domiciles recognized by the law. It is generally held that the subject may be divided into three general classes: (1) Domicile of origin; (2) domicile of choice; (3) domicile by operation of law. *Smith v. Croom,* 7 Fla. 81; *Louisville & N. R. Co. v. Kimbrough,* 115 Ky. 512 (74 S. W. 229).

The domicile of origin of every person is the domicile of his parents at the time of his birth. In *Prentiss v. Barton,* (Va.) 19 Fed. Cas. 1276 (No. 11384), Chief Justice Marshall said:

"By the general laws of the civilized world, the domicile of the parents at the time of birth, or what is termed the 'domicile of origin,' constitutes the domicile of an infant, and continues, until abandoned, or until the acquisition of a new domicile. in a different place."

The domicile of choice is the place which a person has elected and chosen for himself, to displace his previous domicile. *Warren v. Warren,* 73 Fla. 764 (75 So. 35); *Boyd's Exr. v. Commonwealth,* 149 Ky. 764 (149 S. W. 1022); *Mather v. Cunningham,* 105 Me. 326 (74 Atl. 809); *Duke v. Duke,* 70 N. J. Eq. 135 (62 Atl. 466); *Price v. Price,* 156 Pa. 617 (27 Atl. 291).

Domicile by operation of law is that domicile which the law attributes to a person, independent of his own intention or action of residence. This results generally from the domestic relations of husband and wife, or parent and child. *Hindorff v. Sovereign Camp, W. O. W.,* 150 Iowa 185; *In re Guardianship of Benton,* 92 Iowa 202; *Jenkins v. Clark,* 71 Iowa 552.

In the instant case, we have to deal only with the first two kinds of domicile: that is, domicile of origin and domicile of choice. Applying these general definitions to the facts of this case, the domicile of origin of Evan Jones was in Wales, where he was born, and the domicile of choice was Wapello County, Iowa. The question that concerns us is, Where was his domicile for the purpose of descent of personal property on the 7th day of May, 1915, when the Lusitània was sunk off the western coast of the British Isles?

The matter of the determination of any person's domicile arises in different ways, and is construed by the courts for a variety of different purposes. Apparent inconsistencies occur in the authorities, because of the failure to clearly preserve the distinctions to be made by reason of the purpose for which the determination of one's domicile is being legally ascertained. The question frequently arises where it becomes important to determine the domicile for the purpose of taxation, or for the

purpose of attachment, or for the levy of execution, or for the exercise of the privilege of voting, or in determining the statute of limitations, or in ascertaining liability for the support of paupers, and perhaps other purposes. Definitions given in regard to the method of ascertaining the domicile for one purpose are not always applicable in ascertaining the domicile for another purpose. Some of the courts have made the broad assertion that a person can have only one domicile. We appear to have so declared in *Farrow v. Farrow,* 162 Iowa 87; *Savage v. Scott,* 45 Iowa 130; *Love v. Cherry,* 24 Iowa 204. Other courts have declared that a person may have a domicile at one place for one purpose and at another place for another purpose. *Smith v. Croom,* 7 Fla. 81; *Lau Ow Bew v. United States,* 144 U. S. 47 (12 Sup. Ct. Rep. 517). Confusion has frequently arisen because of a failure to distinguish between domicile and residence.

Generally speaking, it is an established rule that a person can have but one domicile *at the same time for the same purpose.* In any event, it is the uniform holding that a person can have only one domicile for the purpose of descent of personal property. *White v. Brown,* supra; *Merrill's Heirs v. Morrissett,* 76 Ala. 433; *Mather v. Cunningham,* 105 Me. 326 (74 Atl. 809); *Greene v. Greene,* 11 Pick. (Mass.) 410; *Isham v. Gibbons,* 1 Bradf. Sur. (N. Y.) 69; *Somerville v. Somerville,* 5 Ves. Jr. 750; *Smith v. Croom,* supra.

In the instant case, we are concerned only in the matter of the domicile of the decedent, Evan Jones, as it affects the question of the descent of his personal estate. An examination of the record satisfies us that the evidence is sufficient to amply justify a finding that the said decedent disposed of his property in Wapello County, Iowa, and converted the same into money or securities, and left Wapello County, Iowa, with the present intention of abandoning his domicile there, and without any present intention of returning thereto, and also with the express intention of returning to his native country, Wales, to make his permanent home there. Or, in the language of the books, decedent's intention was to abandon his domicile of choice and return to his domicile of origin. He died *in itinere.* It is needless for us to cite the vast number of cases announcing the

general rule that the acquisition of a new domicile must have been completely perfected, and hence there must have been a concurrence both of the fact of removal and the intent to remain in the new locality, before the former domicile can be considered lost. The cases from many of the states are collected in 19 Corpus Juris 423.

At the outset, it is obvious that, under the circumstances of the instant case, the domicile of the decedent at the time of his death must, in any event, be determined by the assumption of a fiction. All will agree that the decedent did not have a domicile on the Lusitania. In order to determine his domicile, then, one of two fictions must be assumed: either that he retained the Iowa domicile until one was acquired in Wales, or that he acquired a domicile in Wales the instant he abandoned the Iowa domicile and started for Wales, with the intent and purpose of residing there. Which one of these fictions shall we assume, for the purpose of determining the disposition of his personal property? This question first came before the courts at an early day, long before our present easy and extensive methods of transportation, and at a time before the present ready movement from one country to another. At that time, men left Europe for the western continent or elsewhere, largely for purposes of adventure, or in search of an opportunity for the promotion of commerce. It was at a time before the invention of the steamboat and before the era of the oceanic cable. Men left their native land, knowing that they would be gone for long periods of time, and that means of communication with their home land were infrequent, difficult, and slow. The traditions of their native country were strong with these men. In the event of death while absent, they desired that their property should descend in accordance with the laws of the land of their birth. Many such men were adventurers, who had the purpose and intent to eventually return to the land of their nativity. There was a large degree of patriotic sentiment connected with the first announcement of the rules of law in the matter of the estates of such men. The idea found expression in the phrase, "Once an Englishman, always an Englishman," and in the kindred declaration, "A man must intend to become a Frenchman instead of an Englishman." *Moorhouse v. Lord,* 10 H. L.

C. 272. This popular and patriotic idea was expressed in the familiar lines of Sir Walter Scott:

"Breathes there the man with soul so dead
    Who never to himself hath said,
'This is my own, my native land;'
Whose heart hath ne'er within him burned,
    As home his footsteps he hath turned,
From wand'ring on a foreign strand?"

Many men, especially of English birth, became traders in the American colonies or in India. The Englishman of that day was a firm believer in the law of primogeniture, and desired that his estate should descend according to the established laws of his native land.

These reasons, which were, to an extent at least, historical and patriotic, found early expression in the decisions of the courts on the question of domicile. The general rule was declared to be that a domicile is retained until a new domicile has been actually acquired. At an early time, however, an exception was engrafted upon this rule to the effect that, *for the purposes of succession,* a party abandoning a domicile of *choice,* with the intent to return to his domicile of *origin,* regains the latter the instant that the former domicile is abandoned.

It will be observed that this exception involves two elements: First, that the party is seeking to return from a domicile of choice to a domicile of origin; and second, that the question arises in a case involving succession to an estate. It is apparent that this exception to the general rule grew out of the conditions that we have before suggested, and was a recognition of the desire on the part of the English trader in distant lands to have his estate administered according to the laws of the land of his birth.

One of the earliest cases in the English courts upon this question was *Somerville v. Somerville,* 5 Ves. Jr. 750, decided in 1801. In that case, Lord Somerville had a large estate of lands in Scotland. He also maintained a home in London, and spent a large portion of his time in each place. He had been educated in England, and lived according to the fashion and

style of an Englishman. He had declared that he considered himself an Englishman, and his only reason for spending any portion of his time on his estates in Scotland was because of a promise to his father that he would do so; and accordingly he spent about half of his time in each country. He died at his London residence in 1796. The question arose as to the descent of his personal estate. The Master of the Rolls said (page 784) :

"The succession to the personal estate of an intestate is to be regulated by the law of the country in which he was a domiciled inhabitant at the time of his death, without any regard whatsoever to the place either of the birth or the death, or the situation of the property at that time."

He further said:

"Though a man may have two domiciles for some purposes, he can have only one for purposes of succession."

Special stress was laid on the fact that the domicile of origin of the decedent was in Scotland, and the court held that the decedent "never ceased to be a Scotchman."

In the same year, 1801, the case of *The Indian Chief*, 3 C. Rob. 12, was decided by the Admiralty Court. In that case, a ship and cargo were seized in the harbor of Cowes. The owner had been born in America, but had been living for some years in England, carrying on trade, and had also resided in France. Speaking of him, the court said:

"He came, however, to this country in 1783, and engaged in trade, and has resided in this country until 1797. During that time he was, undoubtedly, to be considered as an English trader, for no position is more established than this: that, if a person goes into another country and engages in trade, and resides there, he is, by the law of nations, to be considered as a merchant of that country. * * * It must be held that, from the moment he turns his back on the country where he has resided, on his way to his own country, he was in the act of resuming his original character, and is to be considered as an American. The character that is gained by residence ceases by residence. It is an adventitious character which no longer adheres to him, from the moment that he puts himself in motion, *bona fide,* to quit the country, *sine animo revertendi.*"

The reason for the rule as it is announced by text-writers

and courts is well set forth in the foregoing case. The thought is evident that one who becomes domiciled in a foreign country for purposes of trade, and who abandons such domicile for the purpose of returning to his native land, reinvests himself at once with his domicile of origin.

A little later on, in 1812, the question came before the United States Circuit Court in the case of *The Ann Green* (Mass.), 1 Fed. Cas. 958 (No. 414). Mr. Justice Story rendered the opinion in the case, and therein declared:

"I accede to the doctrine that fewer circumstances are necessary to constitute domicile in case of native subjects than of foreigners; and that, as native allegiance easily reverts, so the presumption against the party is much heightened by the shipment, being made from a port of his native country."

It is significant, in view of the pronouncements later made by this eminent jurist in his work on the "Conflict of Laws," that at this time he recognized the rule that *"native allegiance easily reverts."*

In 1814, the question came before the Supreme Court of the United States in the case of *The Venus,* 8 Cranch (U. S.) 253. Mr. Justice Washington, speaking for the court, cited with approval the case of *The Indian Chief,* supra, and said:

"Having once acquired a national character, by residence in a foreign country, he ought to be bound by all the consequences of it, until he has thrown it off, either by an actual return to his native country or to that where he was naturalized, or by commencing his removal, *bona fide,* and without an intention of returning."

In *Prentiss v. Barton,* supra, decided in 1819, it is said, referring to domicile:

"As it gives political rights, which are not lost by a mere change of domicile, it is recovered by any manifestation of a disposition to resume the native character; perhaps, by a surrender of a new domicile. In fact, it may be considered rather as suspended than annihilated."

It is apparent that the court gave consideration to the idea that "political rights" entered into a consideration of the matter, at least so far as furnishing a reason for the recognition of the rule that the domicile of origin easily reverts is concerned.

It is the same idea as expressed by the English courts in establishing the rule because of "native allegiance."

In 1829, the question was again before the English court of chancery, under circumstances more nearly like those of the instant case, in the case of *Munroe v. Douglas,* 5 Madd. Ch. Rep. 379. In that case, it appeared that Munroe was born in Scotland, and went to Calcutta, India, to practice his profession as a surgeon. He married, and lived in India for some time. He left India in 1815, declaring his purpose to spend the remainder of his days in Scotland. On the way, he stopped in England and took a house, and on account of ill health, was unsettled and undetermined whether to continue to reside in England or to spend the remainder of his days in Scotland or to go to France. He went to Scotland on a visit, and while there died. The question in the case was where the decedent was domiciled at the time of his death. The vice chancellor held that a domicile cannot be lost by mere abandonment, and that it remains until a subsequent domicile is acquired, "unless the party die *in itinere* toward an intended domicile." Under the facts of the case, the court held that the decedent had formed no settled purpose to settle in Scotland at the time of his death, and that, therefore, his domicile was in India. The court said:

"A domicile in India is, in legal effect, a domicile in the province of Canterbury, and the law of England, and not the law of Scotland, is, therefore, to be applied to his personal property."

In 1834, Mr. Justice Story wrote the first edition of his great work on the "Conflict of Laws." In it he stated (Section 47):

"If a man has acquired a new domicile different from that of his birth, and he removes from it with an intention to resume his native domicile, the latter is reacquired, even while he is on his way, *in itinere;* for it reverts from the moment the other is given up."

In Section 48, he said:

"A national character, acquired in a foreign country by residence, changes when the party has left the country *animo non revertendi,* and is on his return to the country where he had his antecedent domicile. And especially if he be *in itinere*

to his native country with that intent, his native domicile revives while he is yet *in transitu;* for the native domicile easily reverts. The moment a foreign domicile is abandoned, the native domicile is reacquired.''

This pronouncement by Mr. Justice Story has been frequently referred to by the courts, both English and American, in discussing this question, and has been the basis for decisions, particularly in the English courts.

In the case of *In the Goods of Bianchi,* 3 Sw. & T. 16, decided in 1862, the English court of probate said:

''The deceased was originally domiciled in Genoa; he then became domiciled in the Brazils; and there is no doubt of the fact that he died *in itinere,* as he was returning to Genoa, to resume his permanent residence there. Then it may be said that, as soon as he had finally abandoned the acquired domicile by setting off on his journey to return to his domicile of origin, the latter revived.''

From the meager statement in this case, it is apparent that the decedent was a trader, and was domiciled in Brazil solely for the purposes of trade.

The leading and most frequently cited English case is that of *Udny v. Udny,* L. R. 1 H. L. (Sc.) 441 (7 Ct. of Sess., 3d Ser. 89). In this case, the question arose as to the domicile of one Udny, who was born in Scotland, and who afterward resided in England and in France. The Lord Chancellor declared:

''But the domicile of origin is a matter wholly irrespective of any animus on the part of its subject. He acquires a certain *status civilis,* * * * which subjects him and his property to the municipal jurisdiction of a country which he may never even have seen, and in which he may never reside during the whole course of his life, his domicile being simply determined by that of his father.''

It is further said:

''It seems reasonable to say that, if the choice of a new abode and actual settlement there constitute a change of the original domicile, then the exact converse of such a procedure, viz., the intention to abandon the new domicile, and an actual abandonment of it, ought to be equally effective to destroy the new domicile. * * * Why should not the domicile of origin,

cast on him by no choice of his own, and changed for a time, be the state to which he naturally falls back when his first choice has been abandoned *animo et facto,* and whilst he is deliberating before he makes a second choice?"

Lord Chelmsford quotes with approval from Story, in his Conflict of Laws, and says:

"The meaning of Story, therefore, clearly is that the abandonment of a subsequently-acquired domicile *ipso facto* restores the domicile of origin. This doctrine appears to be founded upon principle, if not upon direct authority."

He further states:

"The domicile of origin always remains, as it were, in reserve, to be resorted to in case no other domicile is found to exist."

Lord Westbury, in discussing the case, also said:

"When another domicile is put on, the domicile of origin is for that purpose relinquished, and remains in abeyance during the continuance of the domicile. But, as the domicile of origin is the creature of law, and independent of the will of the party, it would be inconsistent with the principles on which it is by law created and ascribed, to suppose that it is capable of being by the mere act of the party entirely obliterated and extinguished. It revives and exists whenever there is no other domicile, and it does not require to be regained or reconstituted *animo et facto* in the manner which is necessary for the acquisition of a new domicile of choice.  *  *  *  Its acquisition, being a thing of choice, was equally put an end to by choice. He lost it the moment he set foot on the steamer to go to Boulogne, and he reacquired his domicile of origin."

The whole theory of this case and the discussion throughout illustrate the basis of the English rule that the domicile of origin is always retained, and that the acquisition of a domicile of choice constitutes a mere suspension or holding in abeyance of the domicile of origin. In *King v. Foxwell,* 3 Ch. D. (1876) 518, the court said:

"A man may abandon his domicile of choice without acquiring, in strictness, any new domicile, because his domicile of origin reverts."

In *White v. Brown,* supra, the court submitted the question of domicile to the jury, and stated:

"That the domicile of origin easily reverts, and that it requires fewer circumstances to constitute domicile in a native *subject or citizen* than to impress the *national character* on one who is originally of another character. The acquired domicile, however, must be finally abandoned before the domicile of origin can revert." (The italics are ours.)

The foregoing authorities are sufficient to indicate the origin of the exception to the general rule, and to illustrate its application by the courts. As early as 1868, the Supreme Court of the state of Connecticut made a clear and important distinction in the application of this rule, in the case of *First Nat. Bank v. Balcom,* 35 Conn. 351. In it the court said:

"But the principle that a native domicile easily reverts applies only to cases where a native citizen of one country goes to reside in a foreign country, and there acquires a domicile by residence, *without renouncing his original allegiance.* In such cases, his native domicile reverts as soon as he begins to execute an intention of returning: that is, from the time that he puts himself in motion *bona fide* to quit the country *sine animo revertendi,* because the foreign domicile was merely adventitious and *de facto,* and prevails only while actual and complete. * * * *This principle has reference to a national domicile in its enlarged sense, and grows out of native allegiance or citizenship.* It has no application when the question is between a native and acquired domicile, where both are under the same national jurisdiction." (The italics are ours.)

The Supreme Court of Connecticut, in this case, evidently fully appreciated the source and origin of the rule as laid down by Story and as announced by the English courts and by the early Federal decisions. The basis of the rule was the fact of the *native allegiance,* which was assumed to revert the instant the foreign domicile had been abandoned.

It is true that the question of domicile is not to be determined by the question of citizenship; but, when we are assuming the fiction that the domicile of origin reverts immediately upon the abandonment of a domicile of choice, and assume that fiction *because of native allegiance* to the land of one's birth,

then the basis for the fiction and assumption is destroyed when it appears that the party has renounced his native allegiance and has secured citizenship in the land of his domicile of choice. The reason for the rule having failed, the rule fails also.

In *Plant v. Harrison*, 36 Misc. Rep. 649 (74 N. Y. Supp. 411), it is said:

"While a domicile of origin reverts easily upon relinquishment of a domicile of choice, the American decisions have not gone the length of the English authorities in the application of this principle. The English rule that the domicile of origin reverts at once upon the abandonment of the domicile of choice has not been followed in this country, where the rule seems to be that a domicile once acquired continues, not only until it is abandoned, but until another is acquired."

It has been held that the English rule applies only when a question arises where the domicile of origin is under one general government and the domicile of choice under another, and that it has *no* application where the native and the acquired domicile are under the same national jurisdiction. *First Nat. Bank v. Balcom,* supra. On the other hand, it has also been held that the rule applies to changes from one country to another, or from one state of the Union to another. *Denny v. Sumner County,* 134 Tenn. 468 (184 S. W. 14).

Appellants cite *In re Robitaille,* 78 Misc. Rep. 108 (138 N. Y. Supp. 391). The party was an English subject, born in Canada, who removed to New York and there engaged in business. He became naturalized, and afterward closed out his business and declared his intention to return to the place of his birth, to live the remainder of his life. Before doing so, however, he became insane, and a guardian was appointed for him, who carried out his original wishes, and he was taken by the guardian to his destination in Canada, as he had intended, and there died. The question discussed in the case was largely whether, after he had "put himself in motion to resume his domicile of origin," and had become incompetent, his guardian could carry out his intention and acquire the intended domicile for him by actually transporting him there. The court held that a court of competent jurisdiction could authorize the guardian to change the domicile of an incompetent in a proper case, and

held, under all of the facts, that the decedent was domiciled in Canada at the time of his death.

In *Rudolph v. Wetherington's Admr.*, 180 Ky. 271 (202 S. W. 652), a resident of Arkansas, having formed and expressed an intention to remove to and become a citizen of Ballard County, Kentucky, in furtherance of that intention left her home in Arkansas, with her belongings, on or about November 20, 1916, arriving in the city of Paducah, Kentucky, November 24th, where she died, November 26, 1916, without ever having been in Ballard County, Kentucky. The question in the case was whether or not the residence of the decedent was in Ballard County, at the time of her death. Following previous decisions that involved a question of taxation, the court of appeals of Kentucky held that, at the time of the death of said decedent, she was not yet a resident of Ballard County, Kentucky, and that the court of that county was without jurisdiction to grant administration upon her estate.

In *Cooper v. Beers*, 143 Ill. 25 (33 N. E. 61), a question of descent was involved. Cordelia D. Cooper was a resident of Bloomington, Illinois, when she married Edward T. Cooper, who was a resident of Cincinnati, Ohio. After the marriage, the parties acquired a residence in St. Louis, Missouri, which they afterward abandoned, intending to ultimately become residents of either Bloomington or Salem, in the state of Illinois; but before they had determined which place, or had adopted any home at either, Mrs. Cooper died. The question raised was as to her domicile at the time of her death. The court held that the proof failed to show with certainty a fixed and unalterable intention to make Illinois presently the home of the decedent, and held:

"The domicile in Missouri remained the domicile of the Coopers, not only until it was abandoned, but also until a new domicile was acquired by actual residence within another jurisdiction, coupled with an intention of making the last acquired residence a permanent home."

In *Burnett v. Meadows' Admr.*, 7 B. Mon. (Ky.) 277 (46 Am. Dec. 517), a resident of Virginia, contemplating a removal to Kentucky, died *en route* before he got out of the state of Virginia, but after he had, with his family and his property,

commenced his intended journey. After his death, the family continued their journey, bringing their property with them, and settled in Kentucky. No part of the property was actually in Kentucky at the time of his death. The court said:

"And had he been domiciled in the state of Virginia at the time of his death, and his property afterwards been brought into this state, no administration on it could have been granted here, as was decided by this court in the case of *Embry v. Miller*, 1 Marshall 300. Inasmuch, however, as this property was *in transitu* when he died, and afterwards reached its destination, and as many inconveniences would necessarily result from the absence of power in our county courts to regulate its administration, it should be regarded as being, at the time of his death, constructively in this state, under the circumstances here presented, solely, however, for the purpose of enabling a county court in this state to grant an administration thereon."

In *Denny v. Sumner County*, supra, the Supreme Court of Tennessee said:

"Reference may be made parenthetically to an exception recognized in this state to the rule that a domicile once fixed remains until another is actually acquired, arising in event of a change from a domicile of choice to that of origin. Then, if the removal be with the intention to resume his domicile of origin, the latter is reacquired before it is reached, or even while the person is *in itinere*, 'for it reverts from the moment the other is given up.' *Allen v. Thomason*, supra, citing Story on Conflict of Laws. The doctrine touching this exception 'is confined, however, to changes from *one country to another, or from one state of the Union to another*.'" (The italics are ours.)

In *Graham v. Public Administrator*, 4 Bradf. Sur. (N. Y.) 127, a woman was *en route* from Scotland, her domicile of origin, to Canada, and died on the way, in a hospital in New York. It was held that the domicile of origin was retained until a new domicile was actually acquired.

The foregoing cases illustrate the various holdings of the authorities.

Perhaps no better case could be found than the instant case, to illustrate the effect of the adoption of the exception to the general rule. The decedent in this case had not only acquired

a domicile in the United States, but had become a citizen of this country. Under the general rule, if he had abandoned his domicile in Iowa with the intention of acquiring a domicile in Norway or in France, and had been on the ill-fated Lusitania, it would have been universally held that the domicile in Iowa was still retained. No one will dispute that proposition. But because, although a citizen of the United States, residing here for many years, he was *en route* to Wales, the land of his birth, instead of to some other country, it is contended that he acquired a domicile in *that* country instantly upon abandoning his domicile in Iowa. If some native of Iowa had done exactly what the decedent did,—had disposed of his property, with the avowed and declared intention of abandoning his domicile in Iowa and of securing one in Wales, and had accompanied Jones on his trip, and had gone down on the same boat,—his estate would have been administered according to the laws of the state of Iowa, because he had not yet acquired a new domicile anywhere else; while Jones's estate, under the theory of the English rule, would be administered according to the laws of Wales, because he happened to have been born in that country. If such a rule is to be applied as between different states of the Union, with our freedom of movement between the various states, it would lead to very startling results. The laws of the states differ greatly in regard to descent. There is no logical reason why the rule should not be applied between different states of the Union as readily as between different governments. Under such a doctrine, if applied between the various states of the Union, if a man had been born in the state of New York, and at an early age had removed to Iowa, and had lived in this commonwealth for many years, had voted here, and had become familiar with our laws, and should finally decide to remove to New York to live, and should die *in itinere*, he would be regarded as domiciled in New York. If, however, under identical circumstances, he intended to remove to Massachusetts, he would be regarded as domiciled in Iowa. What good reason is there why "native allegiance" to the state of New York, where he was born, should be the determining factor which would prevail in such an instance? One reason that is persuasive why such a rule should not be adopted is that a person who in these days abandons his

domicile of origin and acquires a legal domicile in another juris-
diction is, presumably, at least, familiar with the laws of the
jurisdiction of the latter domicile, and there is, to say the least,
as strong a presumption that he desires his estate to be admin-
istered according to the laws of that jurisdiction as of the juris-
diction of the domicile of origin. While there may have been
a good reason for the establishment of the English rule at the
time and under the conditions under which it was announced,
we do not believe that any good reason exists for the recognition
of such a rule under the circumstances disclosed in this case.
The general rule that a domicile, once legally acquired, is re-
tained until a new domicile is secured, and that, in the acquisi-
tion of such new domicile, the fact and the intention must con-
cur, it seems to us is a rule of universal and general applica-
tion, and there is neither good logic nor substantial reason for
the application of an exception to that rule in the case where
the party is *in itinere* toward the domicile of origin. In other
words, going back to the original proposition, the fiction is as-
sumed generally that any domicile, either of choice or of origin,
is retained until a new domicile has been legally acquired. We
see no good reason for changing that rule in the *one* instance
where the descent of property is involved and the party is *in
itinere* to the domicile of origin. We believe that the general
rule is the better rule, and that the exception laid down by
Story and followed by the English courts should not be recog-
nized, either as between the states of the Union or between this
country and a foreign country, under the facts disclosed in this
case.

It therefore follows that the domicile of the decedent was
in the state of Iowa until a new domicile had been actually ac-
quired in Wales. No such domicile having been acquired at the
time of his death, his personal estate must be administered ac-
cording to the laws of Iowa. We think the general rule should
be followed, even though the decedent was *in itinere* to his domi-
cile of origin at the time of his death.

We have examined the record, and hold that the appellant
was legally recognized as the child of the decedent, as required
by our statute and the decisions of this court, and is his lawful
heir.

It follows that the judgment of the trial court must be, and the same is,—*Reversed.*

EVANS, C. J., STEVENS, ARTHUR, and DE GRAFF, JJ., concur.